Opinion issued July 23, 2009











 






In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00803-CV






IN RE JAMES E. BASHAW & CO., Relator






Original Proceeding on Petition for Writ of Mandamus






O P I N I O N


 Relator, James E. Bashaw & Co. ("JEBCO"), filed a petition for writ of
mandamus challenging the trial court's September 29, 2008 order denying its motion
to compel arbitration in the underlying lawsuit between real party in interest, A. Gary
Kovacs, and JEBCO for breach of contract, tortious interference, and libel and
slander. (1) In its sole issue, JEBCO argues that the trial court abused its discretion and
committed a clear error of law by denying JEBCO's motion to compel Kovacs to
arbitrate his claims against JEBCO.

 We conditionally grant mandamus relief.

Background

 JEBCO is a sole proprietorship formed by James E. Bashaw for the purpose of
conducting his activities as a registered representative of Linsco Private Ledger
Corporation, a/k/a LPL Financial Services ("LPL"), a broker/dealer involved in the
sale of securities and insurance products. On June 19, 2001, Bashaw filed an
"Outside Business Activity/DBA Notification Form" with LPL, as required by the
National Association of Securities Dealers ("NASD"), now the Financial Industry
Regulatory Authority, Inc. ("FINRA"), and by LPL's compliance department, before
a registered representative can engage in the disclosed activity. The form stated,
"[FINRA] requires that Registered Representatives disclose all outside business
activities to their broker/dealer and on their Uniform Application for Securities
Industry Registration (Form U-4)," including insurance sales, financial planning, and
conducting business or holding oneself out as a registered investment adviser. It
further stated, "A DBA name is a name used by a registered representative to identify
his/her LPL business activities to the public, and may be a corporation, partnership
or sole proprietorship." In this case, Bashaw's DBA Notification Form stated that he
intended to conduct his activities as a branch manager of LPL under the name James
E. Bashaw & Co, a sole proprietorship. Bashaw checked the boxes stating that he
was not "currently involved in any business activities other than the activities
performed as a registered representative of LPL, that he had a financial interest in
JEBCO, that his interest in JEBCO was "100%," that the duties and authority of the
position being disclosed were those of a "Branch Manager," and that he was
compensated by "commissions." 

 The DBA Notification Form instructs that "[a]fter notifying the Registered
Representative of the approval of an outside business activity, the Compliance
department will forward this form to the LPL Registration department which will
assist in disclosing the activity on Form U-4." The instructions on the DBA
Notification Form clearly state, "This notification form must be received and
approved in writing by the LPL Compliance department prior to engaging in the
disclosed activity," namely the activity of Bashaw's serving as a branch manager for
LPL under the business name of JEBCO. LPL approved Bashaw's DBA Notification
Form on October 23, 2001.

 On November 9, 2001, Bashaw entered into a Representative Agreement and
a Branch Office Manager agreement with LPL. The Representative Agreement
between Bashaw and LPL appointed Bashaw as a "limited agent to solicit purchases
of securities and investments offered through LPL" in its capacities as a
broker/dealer, an investment adviser, and an insurance agency. It also agreed to pay
Bashaw, as the representative, commissions and fees in accordance with various
schedules attached to the agreement. Bashaw was obligated to agree to various
practices required to do business with LPL, including paying "any balance owing to
[LPL] within ten (10) business days of receipt of [LPL's] statement unless other
arrangements are made in writing" and paying "all expenses of [his] business and
conduct[ing] such business in accordance with the rules and regulations of the
Securities and Exchange Commission (SEC), the National Association of Securities
Dealers (NASD), the National Futures Association (NFA)," and others. 

 Bashaw's Representative Agreement contained the following arbitration
provision:

Representative hereby expressly agrees to submit to final and binding
arbitration before the National Association of Securities Dealers, Inc.
any and all disputes, claims or controversies relating to Representative's
association with or termination from LPL. Representative expressly
gives up the right to sue in a court of law or equity, including the right
to a trial by jury. Specific examples of disputes, claims or controversies
that are required to be arbitrated include, but are not limited to,
allegations of unlawful termination, sexual or racial harassment or
discrimination on the job, gender discrimination, and claims of age or
handicap discrimination.


 The Branch Office Manager Agreement authorized Bashaw to "enter into
agreements with Representatives in the branch office under which the Branch Office
Manager shall receive a portion of payments due the Representatives under the [LPL]
Representative Agreement." The Branch Office Manager Agreement also contained
an arbitration provision identical to the one contained in the Representative
Agreement.

 On November 23, 2001, Bashaw signed a Uniform Application for Securities
Industry Registration or Transfer ("Form U-4"), which is used to register securities
professionals with various securities exchanges and organizations, including FINRA. 
The Form U-4 was completed to relicense Bashaw through LPL, which was
designated as his broker/dealer firm on the form. The Form U-4 also contained an
arbitration clause, which stated:

I agree to arbitrate any dispute, claim or controversy that may arise
between me and my firm, or a customer, or any person, that is required
to be arbitrated under the rules, constitutions, or by-laws of the SROs
indicated in Section 4 (SRO REGISTRATION) [in Bashaw's case,
NASD, later FINRA] as may be amended from time to time and that any
arbitration award rendered against me may be entered as a judgment in
any court of competent jurisdiction.


This form also stated:

I authorize all my employers and any other person to furnish to any
jurisdiction, SRO, designated entity, employer, prospective employer,
or any agent acting on its behalf, any information they have, including
without limitation my creditworthiness, character, ability, business
activities, educational backgrounds, general reputation, history of my
employment and, in the case of former employers, complete reasons for
my termination. Moreover, I release each employer, former employer
and each other person from any and all liability, of whatever nature, by
reason of furnishing any of the above information . . . . On April 28, 2004, in his capacity as LPL branch manager under the Branch
Office Manager Agreement, Bashaw sent a letter to Kovacs on JEBCO letterhead
setting out the terms of Kovacs' employment in Bashaw's LPL branch office (the
Compensation Letter). The Compensation Letter extended an offer to Kovacs to "join
James E. Bashaw & Co. as a Managing Director, The Kovacs Group," subject to his
"license transferring with LPL." Provisions in the Compensation Letter included:

You will be paid an amount equal to 70% of your "net" commissions as
defined below. You may select two months in which to be paid 80%.


. . . .


Lastly, because of your experience in the insurance field, we will pay
you 80% of all insurance commissions. Any overrides negotiated by
you for non-Series 7 products will be retained by you in their entirety. 
E.g., a 110% contract, you would be paid the entire 10%.


. . . .


Net commissions are those paid to James E. Bashaw & Co. by LPL or
any other financial services vendor including but not limited to
insurance or financial planning.


The Compensation Letter was signed by Bashaw as president and chief executive
officer of JEBCO. The parties agree that this letter does not contain an arbitration
provision.

 On May 3, 2004, in connection with his employment by JEBCO, Kovacs
entered into a Representative Agreement with LPL identical to the one between
Bashaw and LPL. This Representative Agreement, like Bashaw's, appointed Kovacs
as a "limited agent to solicit purchases of securities and investments offered through
LPL" in its capacities as a broker/dealer, an investment adviser, and an insurance
agency. LPL also agreed to pay Kovacs, as a representative, commissions and fees
in accordance with various schedules attached to the agreement. Regarding these
schedules, the agreement provided:

The schedules attached are subject to change on thirty (30) days written
notice. Unless Representative notifies [LPL] in writing that he/she is
officially terminating his/her registration with [LPL], and that
notification is received at LPL prior to the effective date of the changed
schedule(s), he/she will be bound by the terms of the changed
schedule(s).


The Representative Agreement also required Kovacs

to conform to the rules and regulations of the NASD [now FINRA],
SEC, NFA, CFTC, MSRB and various states, to the applicable federal
and state laws, and conform to the established customs, standards and
procedures of the securities and [LPL]. In complying with such laws,
rules and regulations, Representative shall accept such supervision and
control by his/her branch manager and officers of [LPL] as is necessary
to enforce such laws, regulations and rules.


Kovacs' Representative Agreement provided that it "may be terminated by either
party at any time, without cause, by giving thirty (30) days written notice to the other
party" and that LPL "reserve[d] the right to immediately terminate this Agreement in
the event Representative's Branch Office Manager is terminated or in the process of
being terminated." This Representative Agreement contained an identical arbitration
provision to that in the Representative Agreement between Bashaw and LPL. This
agreement was signed by Kovacs and a representative for LPL. 

 On June 9, 2004, also in connection with his employment, Kovacs signed a
Uniform Application for Securities Industry Registration or Transfer ("Form U-4"), 
to relicense Kovacs through LPL, which was designated as his broker/dealer firm on
the Form U-4. The Form U-4 also contained an arbitration clause identical to
Bashaw's.

 On June 18, 2004, Kovacs began working as a registered representative for
LPL through Bashaw, as branch manager, and JEBCO, the sole proprietorship
through which Bashaw conducted his business activities as branch manager. 

 During 2004 and 2005, the working relationship between Bashaw and Kovacs
functioned well. Beginning in 2005, Bashaw and Kovacs began to experience
conflict based on alleged changes by Bashaw to the commission structure that
determined Kovacs' pay. Because of these conflicts, Kovacs approached another
LPL branch office, Macha & Associates ("Macha"), about transferring his LPL
securities and insurance business. Kovacs negotiated a deal with Macha that included
provisions paying Kovacs 80% of the net commissions on securities products and
between 85% and 90% of net commissions on insurance products, and 100% of all
production bonuses paid by LPL on securities and insurance business generated
through LPL.

 In May 2007, Kovacs sent Bashaw an email request to release him and approve
his lateral transfer to Macha's LPL branch office. Bashaw did not sign the release,
which prevented Kovacs from transferring his business. Bashaw then sent a letter to
LPL on May 11, 2007 in which he stated: "Please accept this letter of termination of
Gary Kovacs without options. Gary has been a disruptive element to our firm for the
last 6 months. I do not want him to be an LPL advisor and as a shareholder I feel that
he will not represent us well." In a letter also dated May 11, 2007, LPL notified
Kovacs that it was terminating its representative relationship with him in 30 days,
under the terms of the Representative Agreement.

 On September 27, 2007, Kovacs filed suit against Bashaw and JEBCO,
alleging claims for breach of contract, tortious interference with his contract with
Macha, attorney's fees, and libel and slander. Kovacs alleged that, at the beginning
of his working relationship with JEBCO, Bashaw, individually and as a representative
of JEBCO, represented to him that he had an unrestricted right to transfer his business
to another LPL branch at any time for any reason. Kovacs alleged that, in 2005,
Bashaw "unilaterally and without notice changed the parties' commission agreement
by reducing the 'net commissions' that were paid on insurance sales from 80% to
70%, wrongfully claiming that annuity products were not insurance products" and
that, at the end of 2006, JEBCO "established a new security commission structure that
only paid [Kovacs] 70% of the 'net commissions' if [Kovacs] met certain monthly
minimums." Kovacs also alleged that JEBCO failed to pay him any production
bonuses that LPL was paying on his production, and that he should have received
either 100% or between 70% and 80% under the April 18, 2004 letter. Kovacs
alleged that these changes breached the terms of the Compensation Letter between
himself and Bashaw. Kovacs also alleged that the May 11, 2007 letter sent by
Bashaw to LPL contained libel and that Bashaw continued to slander him to
customers and to certain wholesalers after Kovacs left JEBCO.

 Bashaw and JEBCO filed an answer and counterclaim on November 8, 2007,
seeking the return of $45,000 it had paid to Kovacs as excess compensation and for
the fair market value of supplies and support services Kovacs used while at JEBCO
to operate an independent business. On March 31, 2008, counsel for Bashaw and
JEBCO sent an email to Kovacs demanding "that all matters in controversy asserted
by or against Gary Kovacs be submitted to arbitration" pursuant to the FINRA (2) Code
of Arbitration Procedure.

 Kovacs' Second Amended Petition, filed April 2, 2008, against James Bashaw
and JEBCO, alleged causes of action for breach of contract based on Bashaw's and
JEBCO's failure to pay him 80% of the net commissions generated on insurance,
money had and received/breach of contract based on Bashaw and JEBCO's
nonpayment of production bonuses paid by LPL based on Kovacs' production,
tortious interference with contract based on Bashaw and JEBCO's refusal to sign the
release allowing Kovacs' transfer of his LPL business to Macha, attorney's fees, libel
and slander based on the letter Bashaw, individually and as a representative of
JEBCO, sent to LPL that led to LPL's revoking Kovacs' status as an LPL
representative and Bashaw's comments made to customers and certain wholesalers
regarding Kovacs' termination by LPL, and punitive damages.

 Kovacs filed a motion for non-suit of Bashaw on April 7, 2008 because
Bashaw had requested that the dispute be submitted to arbitration. The motion for
non-suit did not apply to JEBCO because Kovacs argued that his claims against
JEBCO were not subject to mandatory arbitration.

 On April 8, 2008, Bashaw submitted a claim to FINRA Dispute Resolution,
listing Bashaw, JEBCO, and Kovacs as the parties involved: James E. Bashaw and
James E. Bashaw & Co. vs. Gary Kovacs, FINRA Case No. 08-01055. Kovacs filed
a motion to dismiss the arbitration proceeding along with an answer and a
counterclaim subject to the motion to dismiss. The counterclaim in that proceeding
was essentially identical to his petition in this suit. The arbitration is still pending.

 On April 9, 2008, the trial court granted Kovacs' motion for non-suit of
Bashaw in this case.

 On April 16, 2008, JEBCO filed a motion to stay proceedings in the trial court
pending the completion of the binding arbitration of the claims between Bashaw,
JEBCO, and Kovacs in FINRA arbitration No. 08-01055, arguing that the matters in controversy have been submitted to binding arbitration
pursuant to the rules of the NASD (now FINRA) governing this matter. 
Both the Plaintiff and Counterclaimant are "Persons associated with a
Member" of the NASD. As such they are required to submit all matters
arising out of their business to binding arbitration . . . .


JEBCO also filed a motion to quash discovery because the matters in controversy had
been submitted to binding arbitration.

 Kovacs responded to JEBCO's motion to stay proceedings by arguing that he
non-suited Bashaw "so that he could take this matter up with FINRA to establish that
this suit, as pled, was not a violation of any FINRA rules or regulations" and arguing
that FINRA rules did not require him to arbitrate his claims against JEBCO. On
April 21, 2008, Kovacs sent a Demand for Arbitration and Statement of his claim
against LPL to FINRA Dispute Resolution. The arbitration initiated by Kovacs,
FINRA Case No. 08-01287, styled A. Gary Kovacs vs. LPL Financial Corp., is
likewise still pending. 

 On August 6, 2008, the trial court denied JEBCO's motion to quash discovery
in the instant litigation. On September 19, 2008, JEBCO filed an amended motion
to compel arbitration and to stay the litigation, pointing out that the previous motion
to stay had mentioned arbitration but had not included authority and that the trial
court had not ruled on the motion to stay. In its amended motion to compel
arbitration, JEBCO argued that the doctrine of equitable estoppel applied to Kovacs'
claims and that JEBCO was an associated person under FINRA, thereby requiring
Kovacs to submit to arbitration of his claims against JEBCO. JEBCO also argued
that the trial court was required to stay the proceedings in state court pending the
outcome of the arbitration proceedings.

 On September 29, 2008, the trial court signed an order denying JEBCO's
motion to compel arbitration and to stay the proceedings pending arbitration. JEBCO
filed this petition for writ of mandamus on October 2, 2008. In its petition for writ
of mandamus, JEBCO argues that the trial court erred in denying its motion to compel
arbitration, or, alternatively, that the trial court erred in failing to grant a stay pending
the completion of the pending arbitration between Bashaw and Kovacs.

Motion to Compel Arbitration

 We first address JEBCO's argument that the trial court erred in denying its
motion to compel arbitration. JEBCO argues that Kovacs is required to arbitrate his
claims against it under the FINRA Code of Arbitration Procedure and under its
agreements with LPL due to the doctrine of equitable estoppel.

A. Standard of Review

 Mandamus relief is appropriate only if a trial court abuses its discretion and no
adequate appellate remedy exists. Walker v. Packer, 827 S.W.2d 833, 839 (Tex.
1992) (orig. proceeding). A trial court commits a clear abuse of discretion when its
action is "so arbitrary and unreasonable as to amount to a clear and prejudicial error
of law." Id.

 The parties do not dispute that the Federal Arbitration Act (the "FAA") governs
this case. (3) Because there is no right of interlocutory appeal under the FAA, review
by petition of writ of mandamus is proper. Jack B. Anglin Co. v. Tipps, 842 S.W.2d
266, 272 (Tex. 1992) (orig. proceeding). Under the FAA, "it is the courts rather than
arbitrators that must decide gateway matters, such as whether a valid arbitration
agreement exists," unless there is unmistakable evidence that the parties intended the
contrary. In re Weekley Homes, 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding).

 "Generally under the FAA, state law governs whether a litigant agreed to
arbitrate, and federal law governs the scope of an arbitration clause." Id. Whether
a nonparty may enforce an arbitration clause can involve aspects of either or both. 
See id. at 130-31. As the Texas Supreme Court has already held in analyzing
whether a nonparty may be compelled to arbitrate, we will apply state law while
endeavoring to keep it as consistent as possible with federal law. See id. at 131
("Pending an answer from the United States Supreme Court, we apply state law while
endeavoring to keep it as consistent as possible with federal law.").

B. Arbitration under FINRA

 JEBCO contends that, given the relationships among the parties, the dispute
between Kovacs and Bashaw falls squarely within the scope of FINRA Rule 13200,
which states, 

 13200. Required Arbitration


 (a) Generally


 Except as otherwise provided in the [FINRA] Code [of Arbitration], a dispute
must be arbitrated under the Code if the dispute arises out of the business
activities of a member or an associated person and is between or among:



 

Members;
 Members and Associated Persons; or
 Associated Persons.


FINRA Code Arb. Proc. Indus. Disputes R. 13200(a). (4) The FINRA Code of
Arbitration defines an "associated person" or "person associated with a member" as 

(1) A natural person registered under the Rules of FINRA; or


(2) A sole proprietor, partner, officer, director, or branch manager of a
member, or a natural person occupying a similar status or performing
similar functions, or a natural person engaged in the investment banking
or securities business who is directly or indirectly controlled by a
FINRA member, whether or not such a person is registered or exempt
from registration with FINRA . . . .


FINRA Code Arb. Proc. Indus. Disputes R. 13100(a), (r). Under this definition,
and under Rule 13200, all disputes between or among associated persons, including
Bashaw and Kovacs, and member firms, such as LPL, and arising out of their
business activities must be arbitrated. 

 JEBCO contends that Kovacs' removal of Bashaw from this suit by non-suit
was "clearly an attempt by Kovacs to avoid the industry standard of arbitrating all
disputes between brokers, since Bashaw is indisputably a FINRA 'associated person'
with whom Kovacs is obligated to arbitrate all of his disputes." JEBCO further
contends that all of Kovacs' allegations in the suit are claims against Bashaw recast
as claims against JEBCO in an attempt to avoid arbitration. JEBCO argues that all
of Kovacs' claims arise from Kovacs' employment as a registered representative and
that Kovacs' central allegation is that Bashaw and JEBCO caused LPL to terminate
its Representative Agreement with Kovacs. JEBCO points out that Kovacs and
Bashaw are both securities brokers and "associated persons" subject to the
jurisdiction of FINRA and that the arbitration provisions contained in Bashaw's
Branch Manager Agreement and in Bashaw's and Kovacs' Representative
Agreements and Form U-4s require that all disputes arising from Kovacs'
employment be arbitrated. JEBCO further argues: that JEBCO is merely the entity
through which Bashaw conducts his securities business; that Bashaw reported his use
of an assumed name to LPL, which LPL approved; and that JEBCO has no operations
independent of Bashaw's activities as a Branch Manager of LPL. 

 Kovacs responds that JEBCO, as a corporation, does not qualify as an
associated person under Rule 13200 and that his claims against JEBCO, therefore, are
not subject to arbitration. 

 We find it unnecessary to decide whether JEBCO is an associated person under
FINRA to resolve this case. Rather, we conclude that the gateway question is
whether Kovacs, a FINRA associated person, is attempting by artful pleading to avoid
FINRA arbitration by non-suiting his claims against Bashaw, also an associated
person, and by alleging breach of contract and tort claims arising out of the business
activities of Bashaw as branch manager for LPL only against JEBCO, thereby seeking
a direct benefit under his U-4 or his Representative Agreement with LPL, a FINRA
member.

C. Arbitration under equitable estoppel / direct benefits estoppel doctrine


 JEBCO argues that the equitable estoppel or direct benefit estoppel doctrine
applies in this case and that Kovacs must rely on the agreements with LPL containing
an arbitration clause in asserting his claims against JEBCO and that Kovacs is
seeking a direct benefit from the LPL agreements containing the arbitration
provisions. JEBCO also argues that the claims against JEBCO are identical to the
claims against Bashaw that were required to be arbitrated under FINRA, that the
claims against JEBCO concern the actions of Bashaw the individual, and that the
claims against JEBCO involve allegations of substantially interdependent and
concerted misconduct by Bashaw, JEBCO, and LPL. 

 "Under both Texas and federal law, whether a claim seeks a direct benefit from
a contract containing an arbitration clause turns on the substance of the claim, not
artful pleading." In re Weekley Homes, 180 S.W.3d at 131-32. If a party or nonparty
seeks to derive a direct benefit from a contract containing an arbitration clause, he
may be compelled to arbitrate under the doctrine of "direct benefits estoppel." Id. at
131 (applying doctrine to nonparty). Claims must be brought on a contract and
arbitrated if liability arises solely from the contract or must be determined by
reference to it. Id. at 132. Claims can be brought in tort and in court, however, if
liability arises from general obligations imposed by law. Id. Therefore, the question
in this case is whether Kovacs is seeking by artful pleading on tort theories against
JEBCO to avoid arbitration of claims that must be determined by reference to his
Representative Agreement or U-4, both of which contain arbitration provisions, and,
therefore, whether, as a non-signatory to those agreements, JEBCO may compel
Kovacs to arbitrate his claims.

 Whether an arbitration agreement can be enforced by a non-signatory is a
"gateway matter" that the courts, rather than arbitrators, must decide. See id. at 130
("Whether an arbitration agreement is binding on a nonparty is one of those gateway
matters."). The abuse of discretion standard constrains our review of the trial court's
decision not to apply equitable estoppel. See Grigson v. Creative Artists Agency,
L.L.C., 210 F.3d 524, 528 (5th Cir. 2000); see also Hill v. G.E. Power Sys., Inc., 282
F.3d 343, 349 (5th Cir. 2002) (recognizing that, when deciding whether to apply
equitable estoppel, "the district court is better equipped to make the call than this
court, and we do not lightly override that discretion"); In re Weekley Homes, 180
S.W.3d at 134-35 (recognizing, in suit where signatory sought to compel arbitration
of non-signatory's claims under direct benefits estoppel, that "the equitable nature of
the doctrine may render firm standards inappropriate, requiring trial courts to exercise
some discretion based on the facts of each case"). 

 Generally, only signatories to an arbitration agreement are bound by the
agreement. Brown v. Pac. Life Ins. Co., 462 F.3d 384, 398 (5th Cir. 2006). However,
"[a] person who has agreed to arbitrate disputes with one party may in some cases be
required to arbitrate related disputes with others." Meyer, 211 S.W.3d at 304 (citing
In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 762 (Tex. 2006) (per curiam) (holding
that party to arbitration agreement must arbitrate tortious interference claims against
other party's agents and affiliates)). However, the Texas Supreme Court has
observed, "Estoppel is one of five or six instances in which the federal circuit courts
require arbitration with nonsignatories." In re Merrill Lynch Trust Co., 235 S.W.3d
185, 191 (Tex. 2007); see also Grigson, 210 F.3d at 526 (holding that "in certain
limited instances, pursuant to an equitable estoppel doctrine, a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a
signatory-plaintiff.").

 In Grigson, the Fifth Circuit adopted the two-prong approach to the intertwined
claims doctrine used by the Eleventh Circuit. Id. at 527. The Grigson court
recognized two circumstances in which equitable estoppel allows a non-signatory to
compel arbitration with a signatory:

First, equitable estoppel applies when the signatory to a written
agreement containing an arbitration clause must rely on the terms of the
written agreement in asserting its claims against the nonsignatory. . . . 
Second, application of equitable estoppel is warranted when the
signatory to the contract containing an arbitration clause raises
allegations of substantially interdependent and concerted misconduct by
both the nonsignatory and one or more of the signatories to the contract.


Id. (quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999)). 
The Grigson court noted that each case turns on its own facts and that equitable
estoppel is "much more readily available when the case presents both independent
bases . . . for applying the intertwined claims doctrine." Id. at 527-28. The Grigson
court went on to state:

[A]lthough arbitration is a matter of contract and cannot, in general, be
required for a matter involving an arbitration agreement non-signatory,
a signatory to that agreement cannot, in those instances described in MS
Dealer Serv. Corp., "have it both ways": it cannot, on the one hand, seek
to hold the non-signatory liable pursuant to duties imposed by the
agreement, which contains an arbitration provision, but, on the other
hand, deny arbitration's applicability because the defendant is a non-signatory.


Id. at 528. 

 In In re Vesta Insurance Group, the Texas Supreme Court addressed tortious
interference claims in a suit brought by a former insurance agent against the insurer's
parent corporation, its officers, and its agents when the defendants sought to compel
arbitration even though they were not signatories to the former agent's arbitration
agreement with the insurer. In re Vesta Ins. Group, Inc., 192 S.W.3d at 760-61. It
stated:

Tortious interference claims do not fall comfortably in either category. 
The obligation not to interfere with existing contracts is a general
obligation imposed by law. But it is not imposed on the parties to that
contract, as "a party cannot tortiously interfere with its own contract." 
Nor is it imposed on corporate agents, except for actions completely
contrary to corporate interests. In other words, "a person must be a
stranger to a contract to tortiously interfere with it." Thus, while
liability for tortious interference arises from the general law, nonliability
arises from connections with the contract.


Id. at 761-62 (internal citations omitted). The Vesta court went on to hold that
"tortious interference claims between a signatory to an arbitration agreement and
agents or affiliates of the other signatory arise more from the contract than general
law, and thus fall on the arbitration side of the scale." Id. at 762. It reasoned that
"corporations must act through human agents," and, therefore, "every contract claim
against a corporation could be recast as a tortious interference claim against its
agents." Id.; see also In re Merrill Lynch Trust Co., 235 S.W.3d at 188-89
("Corporations can act only through human agents, and many business-related torts
can be brought against either a corporation or its employees. If a plaintiff's choice
between suing the corporation or suing the employees determines whether an
arbitration agreement is binding, then such agreement have been rendered illusory on
one side.").

 Here, we conclude that Kovacs is seeking a direct benefit from the contracts
with LPL that contain the arbitration provisions. It would be inequitable to allow
Kovacs to seek to enforce rights that depend on his entitlement to receive
commissions or to transfer his business that flow from his agreement with LPL and
at the same time avoid the arbitration provision contained in that agreement. See
In re Weekley Homes, 180 S.W.3d at 130; see also Grigson, 210 F.3d at 527-28. 
Furthermore, all of JEBCO's alleged misdeeds were alleged to have been committed
by Bashaw, the sole shareholder and officer of JEBCO; and JEBCO's alleged
misdeeds, including the libel and slander claims, were committed by Bashaw
pursuant to his authority as a Branch Office Manager for LPL.

 Kovacs, however, argues that his breach of contract claims against JEBCO
rely only on his agreement with JEBCO as embodied in the Compensation Letter
outlining the terms of his employment with JEBCO, and, therefore, they stand
independently of the contracts with LPL. However, the Compensation Letter from
JEBCO to Kovacs can only be understood and implemented in the context of the
business relationships and party rights established in the LPL agreements. Kovacs
must rely on his Representative Agreement with LPL to be entitled to receive any
commissions at all under his subsequent agreement with JEBCO, and JEBCO's
authority to extend the terms in the Compensation Letter and to employ Kovacs
depended on its own representative and branch office agreements with LPL. 
Therefore, determination of JEBCO's liability on Kovacs' claims for breach of the
terms of the Compensation Letter must necessarily "be determined by reference to"
the agreements setting out the working relationships among JEBCO, Bashaw, and
LPL. See In re Weekley Homes, 180 S.W.3d at131-32. Furthermore, Kovacs'
tortious interference claims against JEBCO must also be arbitrated because
resolving that claim will require the parties to refer to JEBCO's role as LPL's
designated supervisor over Kovacs. See In re Vesta, 192 S.W.3d at 761-62.

 Finally, we observe that the U-4 Kovacs signed specifically authorizes "all
my employers . . . to furnish to any . . . prospective employer, or any agent acting
on its behalf, any information they have, including without limitation my
creditworthiness, character, ability, business activities, educational backgrounds,
general reputation, history of my employment and, in the case of former employers,
complete reasons for my termination." The U-4 also releases "each employer,
former employer and each other person from any and all liability, of whatever
nature, by reason of furnishing any of the above information." Although it is
correct to say, as Kovacs argues, that JEBCO's agreement with LPL did not give
JEBCO authority to commit libel or slander, Bashaw, as Kovacs' branch manager
for LPL, and JEBCO, as Kovacs' direct employer, were authorized by Kovacs' form
U-4 to report to any prospective employer or its agent in connection with
termination of Kovacs' employment as a registered representative for LPL "any
information they have," including information about Kovacs' general reputation and
employment history, and the reasons for his termination. It is this information
which Kovacs claims was libelous. Any claims arising out of the supply of this
information are directly referable to Kovacs' employment relationship and his
Representative Agreement and form U-4, both of which contained arbitration
clauses. Kovacs' claims for libel and slander are not an independent claims because
JEBCO had an authorized supervisory role. Pursuant to the Representative
Agreement, Kovacs' claims are claims that "relate to the Representative's
association with or termination from LPL." Pursuant to the U-4, they are claims
involving JEBCO's passing of information for which indemnity is provided. Thus,
it will be for an arbitrator to determine whether Kovacs' libel and slander claims
have merit and are or are not subject to the release in his U-4. 

 We conclude that Bashaw's and JEBCO's liability for libel and slander and
tortious interference arising out of the information furnished by Bashaw to Kovacs'
employer, LPL, and his prospective employer can only be determined by reference
to the provisions in is U-4 and Representative Agreement, from which he is seeking
a direct benefit. See In re Weekley Homes, 180 S.W.3d at 132.

 We conclude that Kovacs' removal of Bashaw from this litigation was an
attempt to avoid arbitration since both Bashaw and Kovacs are associated persons
whose disputes arising out of the business activities at issue in this litigation are
referable to arbitration under their Representative Agreements and U-4's, and
Kovacs is seeking a direct benefit from contracts with an arbitration clause. 
Therefore, we hold that JEBCO was clearly entitled to arbitration under the direct-benefits estoppel doctrine and that the trial court erred in denying JEBCO's motion
to compel arbitration. (5)

 We sustain JEBCO's sole issue.

Stay of Litigation

 In the alternative, JEBCO argues that it is entitled to a stay of the litigation
pending the outcome of the two arbitration proceedings. Because we have
determined that the trial court erred in denying JEBCO's motion to compel
arbitration, we hold that trial court must compel arbitration and stay any further
proceedings in the trial court. See 9 U.S.C. §3 (2007) (requiring stay of proceedings
in trial court "upon any issue referable to arbitration").

















Conclusion

 We conditionally grant the petition for writ of mandamus, direct the trial
court to vacate its order denying JEBCO's motion to compel arbitration and to stay,
and direct the trial court to enter an order compelling arbitration of Kovacs' claims. 
The writ will issue only if the trial court fails to comply. 





 


 Evelyn V. Keyes

 Justice


Panel consists of Justices Keyes, Hanks, and Bland.
1. The underlying lawsuit is A. Gary Kovacs v. James E. Bashaw & Co., No. 2007-60100 in the 133rd District Court of Harris County, Texas, the Honorable Lamar
McCorkle presiding. Judge McCorkle has since been replaced by the Hon. Jaclanel
McFarland, who held a hearing to reconsider JEBCO's motion to compel arbitration
and signed an order denying the motion to compel arbitration on March 4, 2009. In
addition to this lawsuit, there are currently two FINRA arbitration proceedings
pending involving the parties and underlying occurrences in this case. The first was
filed by Bashaw and JEBCO against Kovacs: FINRA Case No. 08-01055, styled
James E. Bashaw and James E. Bashaw & Co. v. A. Gary Kovacs, filed April 8, 2008. 
The second was filed by Kovacs against LPL: FINRA Case No. 08-01287, styled A.
Gary Kovacs v. LPL Financial Corporation, filed April 21, 2008.
2. The NASD was consolidated into what is now known as the Financial Industry
Regulatory Authority ("FINRA") in 2007. In re Stanford Group Co., 273 S.W.3d
807, 810 n.1 (Tex. App.--Houston [14th Dist.] 2008) (orig. proceeding). "Courts
continue to enforce NASD arbitration clauses through FINRA arbitration and interpret
and enforce NASD's rules as applicable to FINRA." Id. We use the acronym FINRA
to include NASD. See id.
3. See 9 U.S.C. §§ 1-16 (2007).
4. The FINRA Rules are available online at www.finra.org/ArbitrationMediation/
Rules/index.htm. The FINRA Code of Arbitration is available at
www.finra.org/ArbitrationMediation/Rules/CodeofArbitrationProcedure/index.htm.
5. JEBCO also argues that Kovacs should be compelled to arbitrate his claims against
it because his petition alleged concerted misconduct among JEBCO, Bashaw, and
LPL. As Kovacs argued, the Texas Supreme Court has stated that "we have never
compelled arbitration based solely on substantially interdependent and concerted
misconduct." See In re Merrill Lynch, 235 S.W.3d at 191. However, we have already
held that Kovacs should be compelled to arbitrate his claims against JEBCO because
he is seeking a direct benefit from contracts containing an arbitration clause. 
Therefore, we do not need to address JEBCO's arguments regarding concerted
misconduct. See id. ("We too have applied estoppel when nonsignatories seek a direct
benefit from a contract with an arbitration clause.") (citing In re Weekley Homes, 180
S.W.3d 127, 131-32 (Tex. 2005) (orig. proceeding)).