RHESA HAWKINS BARKSDALE, Circuit Judge:
Solely at issue is whether the district court abused its discretion by applying equitable estoppel to compel arbitration for an action centered on tortious interference with a contract with an arbitration clause, brought by signatories to the contract against non-signatories, the court holding that, because this action is intertwined with, and dependent upon, that contract, its arbitration agreement should be given effect. We AFFIRM.
I.
“Return of the Texas Chain Saw Massacre” (the movie) was filmed in 1993-94; then “obscure actors” Matthew MeConau-ghey and Renee Zellweger acted in it. The movie was produced by Ultra Muchos, Inc., and River City Films, Inc. The trustee for the movie’s owners is Charles Grig-son.
*526 In October 1995, Ultra Muchos and River City entered into a distribution agreement with Columbia TriStar Home Video, Inc. It was given exclusive distribution rights and complete discretion on how to exercise them; the producers were to receive a percentage of the movie’s gross revenue. And, by separate, earlier agreement, the owners were to receive a portion of the producers’ percentage.
In the period post-acting in the movie and prior to the fall of 1996, McConaughey signed an agency contract with Creative Artists Agency, L.L.C. The movie’s distribution was delayed by TriStar to take advantage of Zellweger and McConau-ghey’s success in subsequent movies. Subsequently, however, TriStar gave the movie only a limited distribution.
In district court in mid-1997, Grigson, as trustee, sued Ultra Muchos, River City, and TriStar for breach of the distribution agreement. But, Grigson quickly and voluntarily had the action dismissed that fall, when TriStar sought to enforce the distribution agreement’s arbitration clause, which contains a forum selection provision (Los Angeles County, California).
In late 1997, a few months after the voluntary dismissal of the first action, Grigson, now joined by Ultra Muchos and River City, filed this action in state court against McConaughey and Creative Artists (Defendants) for, inter alia, tortious interference with the distribution agreement, claiming that such interference occurred between McConaughey’s signing with Creative Artists and the movie’s limited distribution. In this regard, Defendants allegedly pressured TriStar to limit the release because they viewed it as an improper exploitation of McConaughey’s success post-acting in the movie.
After the action was removed to federal court on the basis of diversity of citizenship, Defendants, although non-signatories to the distribution agreement, moved to compel arbitration under the agreement. The same district court that had permitted the voluntary dismissal of Grigson’s first action ruled that Grigson, Ultra Muchos, and River City (Appellants) were equitably estopped from relying upon Defendants’ being non-signatories. This was based upon holding that, because the claims are so intertwined with, and dependent upon, the distribution agreement, its arbitration clause should be given effect. Accordingly, in the light of the forum selection provision in the arbitration clause, the court dismissed the action so that the parties could proceed in the mandated forum (Los Angeles County, California).
II.
Arbitration is favored in the law. See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Accordingly, parties to such agreements cannot avoid them by casting their claims in tort, rather than in contract. See e.g., Acevedo Maldonado v. PPG Indus., Inc., 514 F.2d 614, 616 (1st Cir.1975). Likewise, proceedings against parties and non-parties to the arbitration agreement are stayed pending the outcome of arbitration, when the action against the non-party is dependent upon interpretation of the underlying contract. See Subway Equip. Leasing Corp. v. Forte, 169 F.3d 324, 329 (5th Cir.1999). Similarly, as discussed infra, in certain limited instances, pursuant to an equitable estoppel doctrine, a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff.
In the distribution agreement, Ultra Muchos, River City, and TriStar agreed
that any dispute or controversy relating to any of the matters referred to in clauses (d)(i),(ii), or (iii), above, shall be decided by a Renb-A-Judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Los Angeles Superior Court) appointed in accordance with California Code of Civil Procedure Section 638, sitting without a jury, in Los Angeles County Cali *527 fornia, and the Parties hereby submit to the jurisdiction of such court.
The parties to this action agree that this procedure is the equivalent of arbitration, which would be subject to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The clauses referenced in the arbitration provision concern
(i) the validity and interpretation of this agreement, (ii) the performance by the Parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement....
Because the owners seek compensation through the distribution agreement, Grig-son admits that he is a third party beneficiary of that agreement; and that, therefore, he is required, as are the signatory-producers, to arbitrate with TriStar all disputes concerning that agreement. Appellants contend, however, that they are not required to arbitrate with Defendants, because they are not parties to the distribution agreement; and because, in the alternative, Defendants do not fall within what Appellants view as the quite limited bases for application of equitable estoppel to compel arbitration: either a special relationship to the distribution agreement signatories, or a role in carrying out the agreement’s obligations. Creative Artists and McConaughey counter that, because the charged-tortious interference is intertwined with the distribution agreement, they are entitled, through application of equitable estoppel, to compel arbitration.
This is an issue of first impression for our circuit. Other circuits have, in a few instances, allowed a non-signatory to a contract with an arbitration clause to compel arbitration under an equitable estoppel theory, including when the action is intertwined with, and dependent upon, that contract. E.g., Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir.1993), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994); Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 841 n. 9 (7th Cir.1981).
The Eleventh Circuit has taken the lead in applying equitable estoppel under the intertwined-claims basis. See also McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342 (11th Cir.1984). The test, which rejects the narrow strictures urged by Appellants, see Sunkist, 10 F.3d at 757-58, is framed nicely by that circuit in MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir.1999):
Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a vnitten agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory’s claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory’s claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.
(Internal citations and quotation marks omitted; emphasis added.)
We agree with the intertwined-claims test formulated by the Eleventh Circuit. Each case, of course, turns on its facts. Such equitable estoppel is much more readily applicable when the case presents both independent bases advanced by the Eleventh Circuit for applying the inter *528 twined-claims doctrine. That is the situation here. The linchpin for equitable es-toppel is equity — fairness. For the case at hand, to not apply this intertwined-claims basis to compel arbitration would fly in the face of fairness.
For the above-quoted statement from MS Dealer Serv. Corp. that equitable es-toppel is applied in order to fulfill federal pro-arbitration policy, the Eleventh Circuit quoted from our court’s decision in Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir.1976), which used an intertwined-claims rationale for staying judicial proceedings against two defendants, with links to a third, pending arbitration with plaintiff. Unlike third-defendant, the other two were not signatories to the arbitration agreement with plaintiff. Our court held, accordingly, that the district court had “discretion” to stay the judicial proceedings as to all three defendants, even though, as noted, two were not parties to the arbitration agreement: “[t]he charges against these two defendants were based on the same operative facts and were inherently inseparable from the claims against” third-defendant, a signatory to the agreement. Id. Accordingly, our court concluded that the district court had not abused its discretion.
Although Reisfeld does not apply equitable estoppel per se, its ratio decidendi comports with that for application of that doctrine to allow a defendant non-signatory to an arbitration agreement to compel arbitration with a plaintiff-signatory. In short, although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement cannot, in those instances described in MS Dealer Serv. Corp., “have it both ways”: it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration’s applicability because the defendant is a non-signatory. MS Dealer Serv. Corp., 177 F.3d at 947; Hughes Masonry Co., 659 F.2d at 838-39. Again, to allow such inconsistent positions would be inequitable, to say the least.
Moreover, as noted, it would be especially inequitable where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant. In such instances, that signatory, in essence, becomes a party, with resulting loss, inter alia, of time and money because of its required participation in the proceeding. Concomitantly, detrimental reliance by that signatory cannot be denied: it and the signatory-plaintiff had agreed to arbitration in lieu of litigation (generally far more costly in terms of time and expense); but, the plaintiff is seeking to avoid that agreement by bringing the action against a non-signatory charged with acting in concert with that non-defendant signatory. Of course, detrimental reliance is one of the elements for the usual application of equitable estoppel. E.g., In re Coastal Plains, 179 F.3d 197, 207 (5th Cir.1999), cert. denied, — U.S.-, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000).
Accordingly, whether to utilize equitable estoppel in this fashion is within the district court’s discretion; we review to determine only whether it has been abused. E.g., Scholle Corp. v. Blackhawk Molding Co., 133 F.3d 1469, 1471 (Fed.Cir.1998); Hoefler v. Babbitt, 139 F.3d 726, 727 (9th Cir.), cert. denied, 525 U.S. 825, 119 S.Ct. 70, 142 L.Ed.2d 55 (1998). See In re Coastal Plains, Inc., 179 F.3d at 205 (judicial estoppel). To constitute an abuse of discretion, the district court’s decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous. Id.
The district court did not abuse its discretion by concluding “that Plaintiffs’ claims are so intertwined with and dependent upon the Distribution Agreement that the arbitration agreement within the Dis *529 tribution Agreement should be given effect”. This conclusion is compelled by comparing the complaint (the operative facts for purposes of the motion to compel arbitration) with the distribution agreement (an exhibit to the complaint). This is quickly and amply demonstrated with but a few examples.
The distribution agreement is not the only contract for which tortious interference is claimed. Creative Artists is also charged with such interference with McCo-naughey’s actor’s contract for the movie (another exhibit to the complaint); he is charged with breach of that contract. Among other things, he was required by that actor’s contract to allow use of “his name and photographs ... for commercial and advertising purposes”.
The complaint uses that specific requirement in the actor’s contract in describing how, for the theatrical release (as defined in the distribution agreement) mandated by the distribution agreement, TriStar
had planned to distribute Chainsaw movie posters prominently featuring the likeness and name of McConaughey and, in fact, had printed posters reflecting this plan. Creative Artists, acting for McConaughey, contacted Columbia Tris-tar and successfully pressured it to retreat from its plan for the posters on the grounds that McConaughey’s fame should not be exploited in such a manner in connection with the Chainsaw movie.
This is but part of the charged interference. In addition, the complaint alleges that the theatrical release was delayed initially to take advantage of Zellweger’s post-movie success in another movie, also released by TriStar; that the plan changed to take advantage of both actors’ success; that Creative Artists, on behalf of McCo-naughey, “pressured” TriStar to not make a major release of the movie and, instead, to make only a limited one, to Appellants’ great financial detriment; and that, because of Defendants’ actions, “TriStar failed to exercise its good faith judgment in promoting, exploiting, and distributing” the movie. (Emphasis added.)
As is obvious from the foregoing, and as the district court concluded, these allegations and claims are intertwined with, and dependent upon, the distribution agreement. In addition to Appellants relying on the terms of the agreement in asserting their claims, TriStar and Defendants are charged with interdependent and concerted misconduct.
The distribution agreement, in describing the movie, lists Zellweger arid two others as “starring” in it; McConaughey is not so listed. All rights to the movie are given to TriStar; and, subject to it making a required minimum expenditure in connection with the theatrical release, TriStar has “absolute discretion concerning the exploitation of the [movie] in any and all media”. (Emphasis added.)
In that provision, which obviously lies at the heart of this action, Appellants
agree[d] that the good faith judgment of [TriStar] regarding any matter affecting the exploitation of the [movie] shall be binding and conclusive upon [Appellants] ([TriStar] shall make the determination, within its sole discretion, whether or not to release the [movie] in a given media and/or in a given territory).
(Emphasis added.) “Territory” includes, with some exceptions, “[t]he entire universe”, while “media” includes, but is not limited to, movie theaters.
And, as noted, the distribution agreement’s arbitration clause pertains, inter alia, to the “interpretation of [the distribution] agreement, ... the performance by the Parties of their respective obligations [there]under, and ... all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement”. (Emphasis added.)
In short, the scope of the distribution, the “discretion”, both “absolute” and “sole”, vested in TriStar, and its “good faith judgment” are at the center of this dispute. Among other things, TriStar is *530 charged with, as a result of the claimed interference ("pressure"), not using its "good faith judgment". Although not sued (an obvious attempt to make an end-run around the arbitration clause, as discussed infra), TriStar nevertheless will be involved extensively-and, no doubt, quite expensively-in this dispute, including whether it performed properly under the distribution agreement.
As stated, the foregoing are but a few examples of the intertwining of the claims with the distribution agreement, including the claimed concerted actions by Defendants (non-signatories), with TriStar, a signatory. How possible damages might be computed, in the light of the detailed "accounting" provisions of the agreement, is hut another example.
This action is quite similar to Grigsbn's first action-against TriStar, discussed below. After quickly instituting a voluntary dismissal of that action, when TriStar moved to compel arbitration, Appellants brought this one against McConaughey and Creative Artists, non-signatories to the distribution agreement, for, inter alia, interfering with that agreement. As noted, this is a quite obvious, if not blatant, attempt to bypass the agreement's arbitration clause.
In Grigson's first action, against the two producers (who joined Grigson in this second action) and TriStar, Grigson charged TriStar, as it is also alleged to have done in the action at hand, with "breach[ing] the `good faith judgment' clause . of the distribution agreement". In the alternative, TriStar was charged with fraud. And, the producers, charged with failing to exploit the movie in breach of their contract with the owners, cross-claimed against TriStar. One of the exhibits to the complaint is a 7 January 1997 letter to TriStar from one of the persons owning rights to the movie, in which he stated that he and another similarly-situated person (who had also directed the movie) were "very eager to know what [was] being done by [TriStar] to fully explore the financial possibilities of [the movie]", and then advised: "It goes without saying that [TriStar] has absolute discretion in making those determinations but this does not change my obligation to my investors to see that those decisions are based on what is best for this film". (Emphasis added.) When TriStar moved promptly to compel arbitration, the owners and cross-claim producers quickly folded their tents. The action, filed in district court on 9 June 1997, was dismissed without prejudice on 10 September 1997.
The action at hand was filed two and one-half months later, on 22 December 1997. This time, it was filed in state court. TriStar was no longer a defendant. Its earlier-charged failure to use its contractually required "good faith judgment" was now alleged to have been caused by "pressure" from the new defendants, Creative Artists and McConaughey. In reality, the two actions are the same. In essence, TriStar is a defendant. Each action turns on the meaning of the distribution agreement's numerous-often intricate-provisions, which are unique to the film industry, and on TriStar's conduct in relation to that agreement.
Arguably, the inconsistent positions by Grigson and the two producers in the first and second actions bump up on, if indeed do not satisfy, the prerequisites for judicial estoppel. See In re Coastal Plains, 179 F.3d at 205-07 (purpose of doctrine is to prevent parties "playing fast and loose with the courts"). Judicial es-toppel is not raised; but, because that doctrine protects the judicial system, Id., we can apply it sua sponte in certain instances. See United States For Use of Am. Bank v. C.I.T. Constr. Inc., 944 F.2d 253, 258 (5th Cir.1991).
In any event, comparison of the two actions demonstrates, quite vividly, why the district court, which presided over both actions, did not abuse its discretion in compelling arbitration in the second, by applying the equitable estoppel doctrine *531 crafted for such situations. The claims are intertwined with, and dependent upon, the distribution agreement, including, but not limited to, Defendants (non-signatories) and TriStar (non-defendant signatory) being charged with interdependent and concerted misconduct. Indeed, this action is the quintessential situation for when the doctrine should be applied.
III.
For the foregoing reasons, the judgment is

AFFIRMED.