**In re JAMES E. BASHAW & CO., Relator.**

**No. 01–08–00803–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

July 23, 2009.

Jack D. Ballard, Mary Jo Cantu, Susan Alexander Logsdon, The Ballard Law Firm, Houston, TX, for Relator.

Brian E. Bro, Law Offices of Brian E. Bro, Houston, TX, for real party in interest.

Panel consists of Justices KEYES, HANKS, and BLAND.

## OPINION

EVELYN V. KEYES, Justice.

Relator, James E. Bashaw & Co. ("JEBCO"), filed a petition for writ of mandamus challenging the trial court's September 29, 2008 order denying its motion to compel arbitration in the underlying lawsuit between real party in interest, A. Gary Kovacs, and JEBCO for breach of contract, tortious interference, and libel and slander.[1] In its sole issue, JEBCO argues that the trial court abused its discretion and committed a clear error of law by denying JEBCO's motion to compel Kovacs to arbitrate his claims against JEBCO.

We conditionally **grant** mandamus relief.

## Background

JEBCO is a sole proprietorship formed by James E. Bashaw for the purpose of conducting his activities as a registered representative of Linsco Private Ledger Corporation, a/k/a LPL Financial Services ("LPL"), a broker/dealer involved in the sale of securities and insurance products. On June 19, 2001, Bashaw filed an "Outside Business Activity/DBA Notification Form" with LPL, as required by the National Association of Securities Dealers

("NASD"), now the Financial Industry Regulatory Authority, Inc. ("FINRA"), and by LPL's compliance department, before a registered representative can engage in the disclosed activity. The form stated, "[FINRA] requires that Registered Representatives disclose all outside business activities to their broker/dealer and on their Uniform Application for Securities Industry Registration (Form U–4)," including insurance sales, financial planning, and conducting business or holding oneself out as a registered investment adviser. It further stated, "A DBA name is a name used by a registered representative to identify his/her LPL business activities to the public, and may be a corporation, partnership or sole proprietorship." In this case, Bashaw's DBA Notification Form stated that he intended to conduct his activities as a branch manager of LPL under the name James E. Bashaw & Co., a sole proprietorship. Bashaw checked the boxes stating that he was not "currently involved in any business activities other than the activities performed as a registered representative of LPL, that he had a financial interest in JEBCO, that his interest in JEBCO was "100%," that the duties and authority of the position being disclosed were those of a "Branch Manager," and that he was compensated by "commissions."

The DBA Notification Form instructs that "[a]fter notifying the Registered Representative of the approval of an outside

---

1. The underlying lawsuit is *A. Gary Kovacs v. James E. Bashaw & Co.*, No. 2007–60100 in the 133rd District Court of Harris County, Texas, the Honorable Lamar McCorkle presiding. Judge McCorkle has since been replaced by the Hon. Jaclanel McFarland, who held a hearing to reconsider JEBCO's motion to compel arbitration and signed an order denying the motion to compel arbitration on March 4, 2009. In addition to this lawsuit, there are currently two FINRA arbitration proceedings pending involving the parties and underlying occurrences in this case. The first was filed by Bashaw and JEBCO against Kovacs: FINRA Case No. 08–01055, styled *James E. Bashaw and James E. Bashaw & Co. v. A. Gary Kovacs*, filed April 8, 2008. The second was filed by Kovacs against LPL: FINRA Case No. 08–01287, styled *A. Gary Kovacs v. LPL Financial Corporation*, filed April 21, 2008.

business activity, the Compliance department will forward this form to the LPL Registration department which will assist in disclosing the activity on Form U–4." The instructions on the DBA Notification Form clearly state, "This notification form must be received and approved in writing by the LPL Compliance department prior to engaging in the disclosed activity," namely the activity of Bashaw's serving as a branch manager for LPL under the business name of JEBCO. LPL approved Bashaw's DBA Notification Form on October 23, 2001.

On November 9, 2001, Bashaw entered into a Representative Agreement and a Branch Office Manager agreement with LPL. The Representative Agreement between Bashaw and LPL appointed Bashaw as a "limited agent to solicit purchases of securities and investments offered through LPL" in its capacities as a broker/dealer, an investment adviser, and an insurance agency. It also agreed to pay Bashaw, as the representative, commissions and fees in accordance with various schedules attached to the agreement. Bashaw was obligated to agree to various practices required to do business with LPL, including paying "any balance owing to [LPL] within ten (10) business days of receipt of [LPL's] statement unless other arrangements are made in writing" and paying "all expenses of [his] business and conduct[ing] such business in accordance with the rules and regulations of the Securities and Exchange Commission (SEC), the National Association of Securities Dealers (NASD), the National Futures Association (NFA)," and others.

Bashaw's Representative Agreement contained the following arbitration provision:

Representative hereby expressly agrees to submit to final and binding arbitration before the National Association of Securities Dealers, Inc. any and all disputes, claims or controversies relating to Representative's association with or termination from LPL. Representative expressly gives up the right to sue in a court of law or equity, including the right to a trial by jury. Specific examples of disputes, claims or controversies that are required to be arbitrated include, but are not limited to, allegations of unlawful termination, sexual or racial harassment or discrimination on the job, gender discrimination, and claims of age or handicap discrimination.

The Branch Office Manager Agreement authorized Bashaw to "enter into agreements with Representatives in the branch office under which the Branch Office Manager shall receive a portion of payments due the Representatives under the [LPL] Representative Agreement." The Branch Office Manager Agreement also contained an arbitration provision identical to the one contained in the Representative Agreement.

On November 23, 2001, Bashaw signed a Uniform Application for Securities Industry Registration or Transfer ("Form U–4"), which is used to register securities professionals with various securities exchanges and organizations, including FINRA. The Form U–4 was completed to relicense Bashaw through LPL, which was designated as his broker/dealer firm on the form. The Form U–4 also contained an arbitration clause, which stated:

I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) [in Bashaw's case, NASD, later FINRA] as may be amended from time to time and that any arbitration award rendered against me may

be entered as a judgment in any court of competent jurisdiction.

This form also stated:

I authorize all my employers and any other person to furnish to any jurisdiction, SRO, designated entity, employer, prospective employer, or any agent acting on its behalf, any information they have, including without limitation my creditworthiness, character, ability, business activities, educational backgrounds, general reputation, history of my employment and, in the case of former employers, complete reasons for my termination. Moreover, I release each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any of the above information....

On April 28, 2004, in his capacity as LPL branch manager under the Branch Office Manager Agreement, Bashaw sent a letter to Kovacs on JEBCO letterhead setting out the terms of Kovacs' employment in Bashaw's LPL branch office (the Compensation Letter). The Compensation Letter extended an offer to Kovacs to "join James E. Bashaw & Co. as a Managing Director, The Kovacs Group," subject to his "license transferring with LPL." Provisions in the Compensation Letter included:

You will be paid an amount equal to 70% of your "net" commissions as defined below. You may select two months in which to be paid 80%.

. . . .

Lastly, because of your experience in the insurance field, we will pay you 80% of all insurance commissions. Any overrides negotiated by you for non-Series 7 products will be retained by you in their entirety. E.g., a 110% contract, you would be paid the entire 10%.

. . . .

Net commissions are those paid to James E. Bashaw & Co. by LPL or any other financial services vendor including but not limited to insurance or financial planning.

The Compensation Letter was signed by Bashaw as president and chief executive officer of JEBCO. The parties agree that this letter does not contain an arbitration provision.

On May 3, 2004, in connection with his employment by JEBCO, Kovacs entered into a Representative Agreement with LPL identical to the one between Bashaw and LPL. This Representative Agreement, like Bashaw's, appointed Kovacs as a "limited agent to solicit purchases of securities and investments offered through LPL" in its capacities as a broker/dealer, an investment adviser, and an insurance agency. LPL also agreed to pay Kovacs, as a representative, commissions and fees in accordance with various schedules attached to the agreement. Regarding these schedules, the agreement provided:

The schedules attached are subject to change on thirty (30) days written notice. Unless Representative notifies [LPL] in writing that he/she is officially terminating his/her registration with [LPL], and that notification is received at LPL prior to the effective date of the changed schedule(s), he/she will be bound by the terms of the changed schedule(s).

The Representative Agreement also required Kovacs

to conform to the rules and regulations of the NASD [now FINRA], SEC, NFA, CFTC, MSRB and various states, to the applicable federal and state laws, and conform to the established customs, standards and procedures of the securities and [LPL]. In complying with such laws, rules and regulations, Representative shall accept such supervision and control by his/her branch manager and

officers of [LPL] as is necessary to enforce such laws, regulations and rules. Kovacs' Representative Agreement provided that it "may be terminated by either party at any time, without cause, by giving thirty (30) days written notice to the other party" and that LPL "reserve[d] the right to immediately terminate this Agreement in the event Representative's Branch Office Manager is terminated or in the process of being terminated." This Representative Agreement contained an identical arbitration provision to that in the Representative Agreement between Bashaw and LPL. This agreement was signed by Kovacs and a representative for LPL.

On June 9, 2004, also in connection with his employment, Kovacs signed a Uniform Application for Securities Industry Registration or Transfer ("Form U–4"), to relicense Kovacs through LPL, which was designated as his broker/dealer firm on the Form U–4. The Form U–4 also contained an arbitration clause identical to Bashaw's.

On June 18, 2004, Kovacs began working as a registered representative for LPL through Bashaw, as branch manager, and JEBCO, the sole proprietorship through which Bashaw conducted his business activities as branch manager.

During 2004 and 2005, the working relationship between Bashaw and Kovacs functioned well. Beginning in 2005, Bashaw and Kovacs began to experience conflict based on alleged changes by Bashaw to the commission structure that determined Kovacs' pay. Because of these conflicts, Kovacs approached another LPL branch office, Macha & Associates ("Macha"), about transferring his LPL securities and insurance business. Kovacs negotiated a deal with Macha that included provisions paying Kovacs 80% of the net commissions on securities products and between 85% and 90% of net commissions on insurance products, and 100% of all production bonuses paid by LPL on securities and insurance business generated through LPL.

In May 2007, Kovacs sent Bashaw an email request to release him and approve his lateral transfer to Macha's LPL branch office. Bashaw did not sign the release, which prevented Kovacs from transferring his business. Bashaw then sent a letter to LPL on May 11, 2007 in which he stated: "Please accept this letter of termination of Gary Kovacs without options. Gary has been a disruptive element to our firm for the last 6 months. I do not want him to be an LPL advisor and as a shareholder I feel that he will not represent us well." In a letter also dated May 11, 2007, LPL notified Kovacs that it was terminating its representative relationship with him in 30 days, under the terms of the Representative Agreement.

On September 27, 2007, Kovacs filed suit against Bashaw and JEBCO, alleging claims for breach of contract, tortious interference with his contract with Macha, attorney's fees, and libel and slander. Kovacs alleged that, at the beginning of his working relationship with JEBCO, Bashaw, individually and as a representative of JEBCO, represented to him that he had an unrestricted right to transfer his business to another LPL branch at any time for any reason. Kovacs alleged that, in 2005, Bashaw "unilaterally and without notice changed the parties' commission agreement by reducing the 'net commissions' that were paid on insurance sales from 80% to 70%, wrongfully claiming that annuity products were not insurance products" and that, at the end of 2006, JEBCO "established a new security commission structure that only paid [Kovacs] 70% of the 'net commissions' if [Kovacs] met certain monthly minimums." Kovacs also alleged that JEBCO failed to pay him any production bonuses that LPL was paying on his production, and that he should have

received either 100% or between 70% and 80% under the April 18, 2004 letter. Kovacs alleged that these changes breached the terms of the Compensation Letter between himself and Bashaw. Kovacs also alleged that the May 11, 2007 letter sent by Bashaw to LPL contained libel and that Bashaw continued to slander him to customers and to certain wholesalers after Kovacs left JEBCO.

Bashaw and JEBCO filed an answer and counterclaim on November 8, 2007, seeking the return of $45,000 it had paid to Kovacs as excess compensation and for the fair market value of supplies and support services Kovacs used while at JEBCO to operate an independent business. On March 31, 2008, counsel for Bashaw and JEBCO sent an email to Kovacs demanding "that all matters in controversy asserted by or against Gary Kovacs be submitted to arbitration" pursuant to the FINRA[2] Code of Arbitration Procedure.

Kovacs' Second Amended Petition, filed April 2, 2008, against James Bashaw and JEBCO, alleged causes of action for breach of contract based on Bashaw's and JEBCO's failure to pay him 80% of the net commissions generated on insurance, money had and received/breach of contract based on Bashaw and JEBCO's nonpayment of production bonuses paid by LPL based on Kovacs' production, tortious interference with contract based on Bashaw and JEBCO's refusal to sign the release allowing Kovacs' transfer of his LPL business to Macha, attorney's fees, libel and slander based on the letter Bashaw, individually and as a representative of JEBCO, sent to LPL that led to LPL's revoking Kovacs' status as an LPL repre-

sentative and Bashaw's comments made to customers and certain wholesalers regarding Kovacs' termination by LPL, and punitive damages.

Kovacs filed a motion for non-suit of Bashaw on April 7, 2008 because Bashaw had requested that the dispute be submitted to arbitration. The motion for non-suit did not apply to JEBCO because Kovacs argued that his claims against JEBCO were not subject to mandatory arbitration.

On April 8, 2008, Bashaw submitted a claim to FINRA Dispute Resolution, listing Bashaw, JEBCO, and Kovacs as the parties involved: *James E. Bashaw and James E. Bashaw & Co. v. Gary Kovacs,* FINRA Case No. 08–01055. Kovacs filed a motion to dismiss the arbitration proceeding along with an answer and a counterclaim subject to the motion to dismiss. The counterclaim in that proceeding was essentially identical to his petition in this suit. The arbitration is still pending.

On April 9, 2008, the trial court granted Kovacs' motion for non-suit of Bashaw in this case.

On April 16, 2008, JEBCO filed a motion to stay proceedings in the trial court pending the completion of the binding arbitration of the claims between Bashaw, JEBCO, and Kovacs in FINRA arbitration No. 08–01055, arguing that the

> matters in controversy have been submitted to binding arbitration pursuant to the rules of the NASD (now FINRA) governing this matter. Both the Plaintiff and Counterclaimant are "Persons associated with a Member" of the NASD. As such they are required to submit all matters arising out of their business to binding arbitration....

**2.** The NASD was consolidated into what is now known as the Financial Industry Regulatory Authority ("FINRA") in 2007. *In re Stanford Group Co.,* 273 S.W.3d 807, 810 n. 1 (Tex.App.-Houston [14th Dist.] 2008) (orig.

proceeding). "Courts continue to enforce NASD arbitration clauses through FINRA arbitration and interpret and enforce NASD's rules as applicable to FINRA." *Id.* We use the acronym FINRA to include NASD. *See id.*

JEBCO also filed a motion to quash discovery because the matters in controversy had been submitted to binding arbitration.

Kovacs responded to JEBCO's motion to stay proceedings by arguing that he non-suited Bashaw "so that he could take this matter up with FINRA to establish that this suit, as pled, was not a violation of any FINRA rules or regulations" and arguing that FINRA rules did not require him to arbitrate his claims against JEBCO. On April 21, 2008, Kovacs sent a Demand for Arbitration and Statement of his claim against LPL to FINRA Dispute Resolution. The arbitration initiated by Kovacs, FINRA Case No. 08–01287, styled *A. Gary Kovacs v. LPL Financial Corp.*, is likewise still pending.

On August 6, 2008, the trial court denied JEBCO's motion to quash discovery in the instant litigation. On September 19, 2008, JEBCO filed an amended motion to compel arbitration and to stay the litigation, pointing out that the previous motion to stay had mentioned arbitration but had not included authority and that the trial court had not ruled on the motion to stay. In its amended motion to compel arbitration, JEBCO argued that the doctrine of equitable estoppel applied to Kovacs' claims and that JEBCO was an associated person under FINRA, thereby requiring Kovacs to submit to arbitration of his claims against JEBCO. JEBCO also argued that the trial court was required to stay the proceedings in state court pending the outcome of the arbitration proceedings.

On September 29, 2008, the trial court signed an order denying JEBCO's motion to compel arbitration and to stay the proceedings pending arbitration. JEBCO filed this petition for writ of mandamus on October 2, 2008. In its petition for writ of mandamus, JEBCO argues that the trial court erred in denying its motion to compel arbitration, or, alternatively, that the trial court erred in failing to grant a stay pending the completion of the pending arbitration between Bashaw and Kovacs.

## Motion to Compel Arbitration

We first address JEBCO's argument that the trial court erred in denying its motion to compel arbitration. JEBCO argues that Kovacs is required to arbitrate his claims against it under the FINRA Code of Arbitration Procedure and under its agreements with LPL due to the doctrine of equitable estoppel.

### A. Standard of Review

■ Mandamus relief is appropriate only if a trial court abuses its discretion and no adequate appellate remedy exists. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). A trial court commits a clear abuse of discretion when its action is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.*

■ The parties do not dispute that the Federal Arbitration Act (the "FAA") governs this case.[3] Because there is no right of interlocutory appeal under the FAA, review by petition of writ of mandamus is proper. *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272 (Tex.1992) (orig. proceeding). Under the FAA, "it is the courts rather than arbitrators that must decide gateway matters, such as whether a valid arbitration agreement exists," unless there is unmistakable evidence that the parties intended the contrary. *In re Weekley Homes*, 180 S.W.3d 127, 130 (Tex.2005) (orig. proceeding).

■ "Generally under the FAA, state law governs whether a litigant agreed to

---

**3.** *See* 9 U.S.C. §§ 1–16 (2007).

arbitrate, and federal law governs the scope of an arbitration clause." *Id.* Whether a nonparty may enforce an arbitration clause can involve aspects of either or both. *See id.* at 130–31. As the Texas Supreme Court has already held in analyzing whether a nonparty may be compelled to arbitrate, we will apply state law while endeavoring to keep it as consistent as possible with federal law. *See id.* at 131 ("Pending an answer from the United States Supreme Court, we apply state law while endeavoring to keep it as consistent as possible with federal law.").

### B. Arbitration under FINRA

JEBCO contends that, given the relationships among the parties, the dispute between Kovacs and Bashaw falls squarely within the scope of FINRA Rule 13200, which states,

13200. Required Arbitration

(a) Generally

Except as otherwise provided in the [FINRA] Code [of Arbitration], a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among:

• Members;

• Members and Associated Persons; or

• Associated Persons.

FINRA CODE ARB. PROC. INDUS. DISPUTES R. 13200(a).[4] The FINRA Code of Arbitration defines an "associated person" or "person associated with a member" as

(1) A natural person registered under the Rules of FINRA; or

(2) A sole proprietor, partner, officer, director, or branch manager of a member, or a natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlled by a FINRA member, whether or not such a person is registered or exempt from registration with FINRA. . . .

FINRA CODE ARB. PROC. INDUS. DISPUTES R. 13100(a), (r). Under this definition, and under Rule 13200, all disputes between or among associated persons, including Bashaw and Kovacs, and member firms, such as LPL, and arising out of their business activities must be arbitrated.

JEBCO contends that Kovacs' removal of Bashaw from this suit by non-suit was "clearly an attempt by Kovacs to avoid the industry standard of arbitrating all disputes between brokers, since Bashaw is indisputably a FINRA 'associated person' with whom Kovacs is obligated to arbitrate all of his disputes." JEBCO further contends that all of Kovacs' allegations in the suit are claims against Bashaw recast as claims against JEBCO in an attempt to avoid arbitration. JEBCO argues that all of Kovacs' claims arise from Kovacs' employment as a registered representative and that Kovacs' central allegation is that Bashaw and JEBCO caused LPL to terminate its Representative Agreement with Kovacs. JEBCO points out that Kovacs and Bashaw are both securities brokers and "associated persons" subject to the jurisdiction of FINRA and that the arbitration provisions contained in Bashaw's Branch Manager Agreement and in Bashaw's and Kovacs' Representative Agreements and Form U-4s require that all disputes arising from Kovacs' employment be arbitrated. JEBCO further argues: that JEBCO is merely the entity through which Bashaw conducts his securities busi-

4. The FINRA Rules are available online at www.finra.org/ArbitrationMediation/Rules/index.htm. The FINRA Code of Arbitration is available at www.finra.org/Arbitration Mediation/Rules/CodeofArbitrationProcedure/index.htm.

ness; that Bashaw reported his use of an assumed name to LPL, which LPL approved; and that JEBCO has no operations independent of Bashaw's activities as a Branch Manager of LPL.

Kovacs responds that JEBCO, as a corporation, does not qualify as an associated person under Rule 13200 and that his claims against JEBCO, therefore, are not subject to arbitration.

We find it unnecessary to decide whether JEBCO is an associated person under FINRA to resolve this case. Rather, we conclude that the gateway question is whether Kovacs, a FINRA associated person, is attempting by artful pleading to avoid FINRA arbitration by non-suiting his claims against Bashaw, also an associated person, and by alleging breach of contract and tort claims arising out of the business activities of Bashaw as branch manager for LPL only against JEBCO, thereby seeking a direct benefit under his U–4 or his Representative Agreement with LPL, a FINRA member.

*C. Arbitration under equitable estoppel/direct benefits estoppel doctrine*

JEBCO argues that the equitable estoppel or direct benefit estoppel doctrine applies in this case and that Kovacs must rely on the agreements with LPL containing an arbitration clause in asserting his claims against JEBCO and that Kovacs is seeking a direct benefit from the LPL agreements containing the arbitration provisions. JEBCO also argues that the claims against JEBCO are identical to the claims against Bashaw that were required to be arbitrated under FINRA, that the claims against JEBCO concern the actions of Bashaw the individual, and that the claims against JEBCO involve allegations of substantially interdependent and concerted misconduct by Bashaw, JEBCO, and LPL.

 "Under both Texas and federal law, whether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading." *In re Weekley Homes,* 180 S.W.3d at 131–32. If a party or nonparty seeks to derive a direct benefit from a contract containing an arbitration clause, he may be compelled to arbitrate under the doctrine of "direct benefits estoppel." *Id.* at 131 (applying doctrine to nonparty). Claims must be brought on a contract and arbitrated if liability arises solely from the contract or must be determined by reference to it. *Id.* at 132. Claims can be brought in tort and in court, however, if liability arises from general obligations imposed by law. *Id.* Therefore, the question in this case is whether Kovacs is seeking by artful pleading on tort theories against JEBCO to avoid arbitration of claims that must be determined by reference to his Representative Agreement or U–4, both of which contain arbitration provisions, and, therefore, whether, as a non-signatory to those agreements, JEBCO may compel Kovacs to arbitrate his claims.

 Whether an arbitration agreement can be enforced by a non-signatory is a "gateway matter" that the courts, rather than arbitrators, must decide. *See id.* at 130 ("Whether an arbitration agreement is binding on a nonparty is one of those gateway matters."). The abuse of discretion standard constrains our review of the trial court's decision not to apply equitable estoppel. *See Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000); *see also Hill v. G.E. Power Sys., Inc.,* 282 F.3d 343, 349 (5th Cir.2002) (recognizing that, when deciding whether to apply equitable estoppel, "the district court is better equipped to make the call than this court, and we do not lightly override that discretion"); *In re Weekley*

*Homes,* 180 S.W.3d at 134–35 (recognizing, in suit where signatory sought to compel arbitration of non-signatory's claims under direct benefits estoppel, that "the equitable nature of the doctrine may render firm standards inappropriate, requiring trial courts to exercise some discretion based on the facts of each case").

 Generally, only signatories to an arbitration agreement are bound by the agreement. *Brown v. Pac. Life Ins. Co.,* 462 F.3d 384, 398 (5th Cir.2006). However, "[a] person who has agreed to arbitrate disputes with one party may in some cases be required to arbitrate related disputes with others." *Meyer v. WMCO-GP, LLC,* 211 S.W.3d 302, 304 (Tex.2006) (citing *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 762 (Tex.2006) (per curiam) (holding that party to arbitration agreement must arbitrate tortious interference claims against other party's agents and affiliates)). However, the Texas Supreme Court has observed, "Estoppel is one of five or six instances in which the federal circuit courts require arbitration with nonsignatories." *In re Merrill Lynch Trust Co.,* 235 S.W.3d 185, 191 (Tex.2007); *see also Grigson,* 210 F.3d at 526 (holding that "in certain limited instances, pursuant to an equitable estoppel doctrine, a non-signatory-to-an-arbitration-agreement-defendant can nevertheless compel arbitration against a signatory-plaintiff.").

In *Grigson,* the Fifth Circuit adopted the two-prong approach to the intertwined claims doctrine used by the Eleventh Circuit. *Id.* at 527. The *Grigson* court recognized two circumstances in which equitable estoppel allows a non-signatory to compel arbitration with a signatory:

First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.... Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.

*Id.* (quoting *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir. 1999)). The *Grigson* court noted that each case turns on its own facts and that equitable estoppel is "much more readily available when the case presents both independent bases ... for applying the intertwined claims doctrine." *Id.* at 527–28. The *Grigson* court went on to state:

[A]lthough arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement *cannot,* in those instances described in *MS Dealer Serv. Corp.,* "have it both ways": it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.

*Id.* at 528.

In *In re Vesta Insurance Group,* the Texas Supreme Court addressed tortious interference claims in a suit brought by a former insurance agent against the insurer's parent corporation, its officers, and its agents when the defendants sought to compel arbitration even though they were not signatories to the former agent's arbitration agreement with the insurer. *In re Vesta Ins. Group, Inc.,* 192 S.W.3d at 760–61. It stated:

Tortious interference claims do not fall comfortably in either category. The obligation not to interfere with existing

contracts is a general obligation imposed by law. But it is *not* imposed on the parties to that contract, as "a party cannot tortiously interfere with its own contract." Nor is it imposed on corporate agents, except for actions completely contrary to corporate interests. In other words, "a person must be a stranger to a contract to tortiously interfere with it." Thus, while liability for tortious interference arises from the general law, *nonliability* arises from connections with the contract.

*Id.* at 761–62 (internal citations omitted). The *Vesta* court went on to hold that "tortious interference claims between a signatory to an arbitration agreement and agents or affiliates of the other signatory arise more from the contract than general law, and thus fall on the arbitration side of the scale." *Id.* at 762. It reasoned that "corporations must act through human agents," and, therefore, "every contract claim against a corporation could be recast as a tortious interference claim against its agents." *Id.; see also In re Merrill Lynch Trust Co.*, 235 S.W.3d at 188–89 ("Corporations can act only through human agents, and many business-related torts can be brought against either a corporation or its employees. If a plaintiff's choice between suing the corporation or suing the employees determines whether an arbitration agreement is binding, then such agreement have been rendered illusory on one side.").

Here, we conclude that Kovacs is seeking a direct benefit from the contracts with LPL that contain the arbitration provisions. It would be inequitable to allow Kovacs to seek to enforce rights that depend on his entitlement to receive commissions or to transfer his business that flow from his agreement with LPL and at the same time avoid the arbitration provision contained in that agreement. *See In re Weekley Homes*, 180 S.W.3d at 130; *see*

*also Grigson*, 210 F.3d at 527–28. Furthermore, all of JEBCO's alleged misdeeds were alleged to have been committed by Bashaw, the sole shareholder and officer of JEBCO; and JEBCO's alleged misdeeds, including the libel and slander claims, were committed by Bashaw pursuant to his authority as a Branch Office Manager for LPL.

Kovacs, however, argues that his breach of contract claims against JEBCO rely only on his agreement with JEBCO as embodied in the Compensation Letter outlining the terms of his employment with JEBCO, and, therefore, they stand independently of the contracts with LPL. However, the Compensation Letter from JEBCO to Kovacs can only be understood and implemented in the context of the business relationships and party rights established in the LPL agreements. Kovacs must rely on his Representative Agreement with LPL to be entitled to receive any commissions at all under his subsequent agreement with JEBCO, and JEBCO's authority to extend the terms in the Compensation Letter and to employ Kovacs depended on its own representative and branch office agreements with LPL. Therefore, determination of JEBCO's liability on Kovacs' claims for breach of the terms of the Compensation Letter must necessarily "be determined by reference to" the agreements setting out the working relationships among JEBCO, Bashaw, and LPL. *See In re Weekley Homes*, 180 S.W.3d at 131–32. Furthermore, Kovacs' tortious interference claims against JEBCO must also be arbitrated because resolving that claim will require the parties to refer to JEBCO's role as LPL's designated supervisor over Kovacs. *See In re Vesta*, 192 S.W.3d at 761–62.

Finally, we observe that the U–4 Kovacs signed specifically authorizes "all my em-

ployers ... to furnish to any ... prospective employer, or any agent acting on its behalf, any information they have, including without limitation my creditworthiness, character, ability, business activities, educational backgrounds, general reputation, history of my employment and, in the case of former employers, complete reasons for my termination." The U–4 also releases "each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any of the above information." Although it is correct to say, as Kovacs argues, that JEBCO's agreement with LPL did not give JEBCO authority to commit libel or slander, Bashaw, as Kovacs' branch manager for LPL, and JEBCO, as Kovacs' direct employer, were authorized by Kovacs' form U–4 to report to any prospective employer or its agent in connection with termination of Kovacs' employment as a registered representative for LPL "any information they have," including information about Kovacs' general reputation and employment history, and the reasons for his termination. It is this information which Kovacs claims was libelous. Any claims arising out of the supply of this information are directly referable to Kovacs' employment relationship and his Representative Agreement and form U–4, both of which contained arbitration clauses. Kovacs' claims for libel and slander are not an independent claims because JEBCO had an authorized supervisory role. Pursuant to the Representative Agreement, Kovacs' claims are claims that "relate to the Representative's association with or termination from LPL." Pursuant to the U–4, they are claims involving JEBCO's passing of information for which indemnity is provided. Thus, it will be for an arbitrator to determine whether Kovacs' libel and slander claims have merit and are or are not subject to the release in his U–4.

We conclude that Bashaw's and JEBCO's liability for libel and slander and tortious interference arising out of the information furnished by Bashaw to Kovacs' employer, LPL, and his prospective employer can only be determined by reference to the provisions in is U–4 and Representative Agreement, from which he is seeking a direct benefit. *See In re Weekley Homes,* 180 S.W.3d at 132.

We conclude that Kovacs' removal of Bashaw from this litigation was an attempt to avoid arbitration since both Bashaw and Kovacs are associated persons whose disputes arising out of the business activities at issue in this litigation are referable to arbitration under their Representative Agreements and U–4's, and Kovacs is seeking a direct benefit from contracts with an arbitration clause. Therefore, we hold that JEBCO was clearly entitled to arbitration under the direct-benefits estoppel doctrine and that the trial court erred in denying JEBCO's motion to compel arbitration.[5]

We sustain JEBCO's sole issue.

---

5. JEBCO also argues that Kovacs should be compelled to arbitrate his claims against it because his petition alleged concerted misconduct among JEBCO, Bashaw, and LPL. As Kovacs argued, the Texas Supreme Court has stated that "we have never compelled arbitration based solely on substantially interdependent and concerted misconduct." *See In re Merrill Lynch,* 235 S.W.3d at 191. However, we have already held that Kovacs should be compelled to arbitrate his claims against JEBCO because he is seeking a direct benefit from contracts containing an arbitration clause. Therefore, we do not need to address JEBCO's arguments regarding concerted misconduct. *See id.* ("We too have applied estoppel when nonsignatories seek a direct benefit from a contract with an arbitration clause.") (citing *In re Weekley Homes,* 180 S.W.3d 127, 131–32 (Tex.2005) (orig. proceeding)).

## Stay of Litigation

In the alternative, JEBCO argues that it is entitled to a stay of the litigation pending the outcome of the two arbitration proceedings. Because we have determined that the trial court erred in denying JEBCO's motion to compel arbitration, we hold that trial court must compel arbitration and stay any further proceedings in the trial court. *See* 9 U.S.C. § 3 (2007) (requiring stay of proceedings in trial court "upon any issue referable to arbitration").

## Conclusion

We conditionally grant the petition for writ of mandamus, direct the trial court to vacate its order denying JEBCO's motion to compel arbitration and to stay, and direct the trial court to enter an order compelling arbitration of Kovacs' claims. The writ will issue only if the trial court fails to comply.