FILED
United States Court of Appeals
Tenth Circuit

November 15, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

LENOX MACLAREN SURGICAL
CORPORATION, a Colorado
corporation,

        Plaintiff – Appellee,

v.

MEDTRONIC, INCORPORATED, a
Minnesota corporation; MEDTRONIC
SOFAMOR DANEK,
INCORPORATED, an
Indiana corporation; MEDTRONIC PS
MEDICAL, INCORPORATED, d/b/a
Medtronic Neurologic Technologies, a
California corporation; MEDTRONIC
SOFAMOR DANEK CO., LTD., a
Japanese corporation,

        Defendants – Appellants.

No. 11-1251
(D.C. No. 1:10-CV-02139-RPM)
(D. Colo)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **ANDERSON**, and **HARTZ**, Circuit Judges.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In this interlocutory appeal, defendants (collectively referred to as the "Medtronic Defendants") appeal the district court's denial of their motion to compel plaintiff Lenox MacLaren Surgical Corporation ("LM") to arbitrate its antitrust claims against them even though none of the Medtronic Defendants signed the distribution and licensing agreement containing the arbitration provision. We affirm.

Background

LM designed and manufactures a bone mill that grinds harvested bone for use in spinal implant surgeries. In April 2000, it entered into an exclusive licensing and distribution agreement ("Agreement") with Medtronic Sofamor Danek USA, Inc. ("MSD USA") for a term of five years. The Agreement gave MSD USA the right to make all decisions regarding marketing of the bone mill. It also required MSD USA to purchase 500 bone mills from LM in the first year and to purchase 100 bone mills per quarter thereafter to maintain its exclusive distribution rights. Included in the Agreement was a dispute-resolution clause pursuant to which the parties agreed to arbitrate "any dispute arising out of or relating to this Agreement." Aplts. App. at AA 184.

MSD USA purchased the first 500 bone mills from LM as required, but did not purchase any bone mills thereafter. LM therefore notified MSD USA in 2001 that its distribution rights were no longer exclusive. MSD USA marketed the 500 bone mills it purchased by selling or loaning them to doctors and hospitals in the

United States and by selling them to its Japanese affiliate, defendant Medtronic Sofamor Danek Co., Ltd. ("Medtronic Japan"), which marketed them in Japan. Under its loaner program, MSD USA included LM's bone mill, free of charge, in packages of other surgical instruments and supplies used in spinal implant surgery that it provided to doctors and hospitals for a fee. After each surgery was completed, the bone mill and other instruments were returned to MSD USA to be sterilized and used again.

In 2006, after the Agreement had expired, MSD USA received complaints from several Japanese doctors that they had discovered metal shavings in the bone material being milled. Based on these complaints, MSD USA asked LM to recall its bone mills. LM refused to do so, believing the problem was caused by user error and could be remedied with additional instructions and warnings or, if necessary, replacement blades. After LM refused to recall the bone mills, MSD USA instituted its own recall in October 2006. Recall notices were sent to all of MSD USA's customers who had either bought or borrowed LM's bone mill. The customers were advised that the bone mill was being voluntarily recalled, that MSD USA representatives would collect the recalled bone mill, and that it would not be replaced with another bone mill, but customers would receive a credit toward future purchases with MSD USA. After MSD USA informed the FDA of the recall, the FDA conducted independent tests and informed LM that it need not recall the bone mills it had sold separately.

Several months after MSD USA instituted the recall, one of its affiliates, defendant Medtronic PS Medical Inc., began selling a stand-alone electric bone mill it had designed, called the Midas Rex Legend. MSD USA customers who had purchased or used LM's bone mill were specifically targeted for sale of the new Midas Rex Legend bone mill.

### The First Lawsuit (*Lenox I*)

In October 2007, LM sued MSD USA in federal court in Colorado, alleging claims for patent infringement, violation of the Colorado Consumer Protection Act (CCPA), and business disparagement/trade libel. LM alleged, among other things, that MSD USA's practice of loaning the bone mill to doctors and hospitals–which LM first learned of in 2006–was not permitted under the Agreement. LM alleged that by loaning its bone mill to doctors for use in thousands of surgeries, MSD USA created a market for a precision bone mill without actually filling it with LM's product. This, in turn, both deprived LM of significant potential income from future sales and provided an opportunity for the competing Midas Rex Legend bone mill to enter the market. LM further alleged that the recall was improper because there was nothing wrong with its bone mill. LM pointed to a variety of improprieties concerning the recall, including MSD USA's reliance on tests that supposedly confirmed the reported problems but that MSD USA knew were faulty, and MSD USA's decision to recall the bone mills without exploring other alternatives.

-4-

The loaner program and the recall formed the basis of LM's three claims in *Lenox I*. LM alleged that because the Agreement permitted MSD USA only to sell, not to loan, LM's bone mill to others, the doctors and hospitals who borrowed the bone mill infringed LM's patent and MSD USA contributed to their infringement. LM also alleged that MSD USA engaged in unfair and deceptive trade practices by knowingly making misrepresentations about LM's bone mill in the recall notice in violation of the CCPA, and that MSD USA's disparaging statements were designed to and had the effect of harming LM's business, constituting actionable business disparagement or trade libel.

MSD USA moved to compel arbitration of LM's claims pursuant to the Agreement, and the district court granted the motion. In its arbitration demand, LM expanded the scope of its claims, adding claims for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, intentional interference with a contract, fraudulent inducement, fraudulent misrepresentation and concealment, intentional interference with prospective economic relations, fraud, and unfair competition. LM later dropped its CCPA claim.

The arbitrators determined, among other things, that MSD USA neither breached the Agreement nor infringed LM's patent by instituting the loaner program. The arbitrators further determined, however, that MSD USA intentionally interfered with LM's prospective economic relations by instituting the recall. They noted it was to MSD USA's competitive advantage to clear the

market of LM's bone mill and then fill the void with the Midas Rex Legend bone mill, and they found numerous improprieties in the recall. The arbitrators therefore concluded that MSD USA's conduct surrounding the recall was both intentional and wrongful. The arbitrators awarded LM damages for MSD USA's tortious interference by calculating the profits made after the recall on the sale of Midas Rex bone mills to customers who had previously bought or borrowed LM's bone mill.[1] MSD USA paid the arbitration award, and the district court dismissed the underlying action. Less than three months later, LM filed the present lawsuit.

### The Current Lawsuit

LM contends that when it filed *Lenox I*, it thought MSD USA was the sole perpetrator of the wrongful conduct it alleged. LM learned that other Medtronic entities were involved only late in the discovery process, when it was too late to add them to the proceedings. Among other things, LM learned that defendant Medtronic, Inc., the overall parent corporation, made the actual decision to recall LM's bone mills and that defendant Medtronic PS Medical, Inc. designed and manufactured the Midas Rex Legend bone mill and targeted its sales to former LM-bone-mill customers. LM sued these two companies as well as MSD USA's immediate parent company, Medtronic Sofamor Danek, Inc. (a wholly owned subsidiary of Medtronic, Inc.), and Medtronic Japan. LM asserted four claims for

---

[1]    MSD USA objected to this measure of damages because it was based on profits made by Medtronic PS Medical, not by MSD USA.

relief, but following motions in the district court, only two claims remain: for monopolization and, alternatively, for attempted monopolization in violation of the Sherman Antitrust Act.

In its complaint, LM refers to all the defendants collectively as either "Medtronic" or the "Medtronic Defendants." Its factual allegations are similar to those in the *Lenox I* complaint, except that "Medtronic" or the "Medtronic Defendants," rather than MSD USA, is named as the principal actor. In both of its antitrust claims, LM alleges that the Medtronic Defendants engaged in the following "array of anticompetitive, predatory, and exclusionary conduct":

> a. Medtronic used the Lenox MacLaren Bone Mill and its Loaner Program to create demand for a precision bone mill.
>
> b. Medtronic destroyed the reputation of the Lenox MacLaren Bone Mill through an improper, unjustified recall, thereby excluding Lenox MacLaren from the Surgical Bone Mill Market.
>
> c. Medtronic filled the artificial void in the market it created with its Midas Rex Legend electric bone mill, thereby acquiring, enhancing, and maintaining its monopoly power in the Surgical Bone Mill Market.

*Id.* at AA 39 (monopolization); *see also id.* at AA 41 (attempted monopolization).

The Medtronic Defendants moved to compel arbitration, arguing that LM's antitrust claims are within the scope of the arbitration clause in the Agreement and that even though the Medtronic Defendants did not sign the Agreement, LM should be equitably estopped from avoiding arbitration of its antitrust claims.

After briefing and a hearing, the district court denied the Medtronic Defendants' motion.

We ordinarily review a district court's order denying or compelling arbitration under a de novo standard. *See, e.g., 1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1055 (10th Cir. 2006). Because estoppel is an equitable theory, however, two circuits have held that when a district court rules on a motion to compel that is based on estoppel, the review should be for an abuse of discretion. *See Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395 (4th Cir. 2005); *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000). Other courts apply a de novo standard even when the motion to compel is based on estoppel. *See, e.g., Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731 (8th Cir. 2009); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 & n.1 (9th Cir. 2009); *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 294 (3d Cir. 2004); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993). We need not decide which standard to apply here, because we would affirm the denial of the Medtronic Defendants' motion even under a de novo standard.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks omitted). The question who may be bound to an arbitration

-8-

provision is governed by state law relating to contracts in general. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S. Ct. 1896, 1902 (2009). "[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Id.* (internal quotation marks omitted).

In general, "[e]quitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417-18 (4th Cir. 2000) (internal quotation marks omitted).

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of [another's] signature on a written contract precludes enforcement of the contract's arbitration clause when [the party] has consistently maintained that other provisions of the same contract should be enforced to benefit him.

*Id.* at 418. A signatory plaintiff "cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Grigson*, 210 F.3d at 528; *see also Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) ("[I]t is unfair for a party to rely on a contract when it works to its advantage, and

repudiate it when it works to its disadvantage." (internal quotation marks omitted)).

Over the last several decades, the federal courts have developed a body of law concerning the application of estoppel to permit a nonsignatory to compel a signatory to arbitrate.[2] The circuits have not uniformly articulated the standards for application of estoppel, but their formulations have contained common elements. The Medtronic Defendants rely on the standards articulated by the Eleventh Circuit in *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999). The Eleventh Circuit held that estoppel will permit a nonsignatory to compel arbitration in two circumstances. The first is when the signatory "'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." *Id.* at 947 (quoting *Sunkist Soft Drinks*, 10 F.3d at 757) (alteration in original). The second is when the signatory alleges "'substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" *Id.* (quoting *Boyd v. Homes of Legend, Inc.*, 981 F. Supp. 1423, 1433 (M.D. Ala. 1997), *abrogated in part on other grounds by Davis v. So. Energy Homes, Inc.*, 305 F.3d 1268 (11th Cir. 2002)).

---

[2]     Before *Arthur Andersen* made it clear that state law governs who may be bound to an arbitration clause, many of the federal cases involving equitable estoppel did not refer to any particular state's law or purport to determine how a particular state's highest court would rule.

The Eleventh Circuit concluded that both circumstances were present in *MS Dealer*. The plaintiff there purchased a car from an auto dealer and under the purchase agreement, she was charged $990.00 for a service contract through MS Dealer. After discovering defects in the car, the plaintiff sued the auto dealer and MS Dealer, asserting claims for breach of contract, breach of warranty, fraud, and conspiracy. She alleged "the $990.00 charge was excessive and . . . the defendants conspired to charge this excessive amount so that they could each profit from the sale of the service contract by divvying up the excess amount." *Id.* at 945. Because the service fee was included in the amount of her car loan, she also alleged that the inflated fee caused her to pay more interest on her loan. The plaintiff's purchase agreement with the auto dealer contained an arbitration clause, pursuant to which MS Dealer sought to compel arbitration.

The Eleventh Circuit concluded the plaintiff's allegations relied on the purchase agreement because even though she did not allege a breach of that contract, her fraud and conspiracy claims each "ma[de] reference to and presume[d] the existence of the $990.00 charge" and "depend[ed] entirely upon her contractual obligation to pay $990.00 for the service contract." *Id.* at 947-48. Further, her claims against the auto dealer and MS Dealer were "inherently inseparable." *Id.* at 948 (internal quotation marks omitted). She specifically alleged that MS Dealer "worked hand-in-hand" with the auto dealer to charge her an excessive fee for the service contract in the purchase agreement, which also

-11-

caused her to pay more interest on the fraudulently inflated debt. *Id.* These "allegations of such pre-arranged, collusive behavior" demonstrated that the plaintiff's claims against MS Dealer were "intimately founded in and intertwined with the obligations imposed by the [purchase agreement]." *Id.* (internal quotation marks omitted).

The Medtronic Defendants argue that LM should be compelled to arbitrate its antitrust claims against them because its claims both rely on the Agreement with MSD USA and allege substantially interdependent and concerted misconduct between MSD USA and the Medtronic Defendants. The Colorado Supreme Court has not addressed whether and under what circumstances equitable estoppel might apply to compel arbitration between a signatory and a nonsignatory. The Colorado Court of Appeals has applied equitable estoppel to compel arbitration between a signatory and a nonsignatory on only one occasion. In *Smith v. Multi-Financial Securities Corp.*, 171 P.3d 1267, 1273-74 (Colo. App. 2007), the court determined the claims brought by the plaintiffs, who opposed arbitration, relied on obligations imposed by the contract containing an arbitration provision. It therefore held the plaintiffs were "estopped from avoiding the arbitration provisions of the same agreements whose benefits they seek to enforce." *Id.* at 1274. We need not decide whether the Colorado Supreme Court would permit a nonsignatory to compel a signatory to arbitrate its claims under either of the two

circumstances identified by the Eleventh Circuit, however, because we conclude that neither of those circumstances is present here.

The Medtronic Defendants contend that LM's claims rely on the Agreement because they are significantly related to, make reference to, or presume the existence of the Agreement and because the Medtronic Defendants could not have carried out the alleged anticompetitive scheme without the Agreement.

For a plaintiff's claims to rely on the contract containing the arbitration provision, the contract must form the legal basis of those claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a "but-for" relationship with them. *See Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1173-74 (11th Cir. 2011) (applying Georgia law). The claims must be "so intertwined with the agreement" that "it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." *PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 835 (8th Cir. 2010).

The Agreement between LM and MSD USA is factually significant to LM's antitrust claims because the Agreement provided the opportunity for the Medtronic Defendants to engage in the anticompetitive conduct alleged. But the Agreement does not form the legal basis for LM's claims. LM is not attempting "to hold the non-signatory liable pursuant to duties imposed by the agreement," *Grigson*, 210 F.3d at 528, and its claims do not depend on whether either MSD

-13-

USA's or the Medtronic Defendants' conduct was proper under the Agreement. LM's allegation that the Medtronic Defendants used the loaner program to further their anticompetitive goals does not depend on whether the Agreement permitted MSD USA to include LM's bone mill in its loaner program. Nor does it matter whether the Agreement permitted MSD USA to institute a recall. What matters is whether the Medtronic Defendants used the recall as a way to clear the market of LM's bone mill so Medtronic PS Medical could substitute its own bone mill. LM's claims do not rely on the terms of the Agreement in a manner that would make it unfair for LM to avoid arbitrating those claims with the Medtronic Defendants.

The Medtronic Defendants also contend LM should be estopped from avoiding arbitration because LM alleges substantially interdependent and concerted misconduct between MSD USA and the Medtronic Defendants. LM argues that it alleges concerted misconduct only among the Medtronic Defendants, not between them and MSD USA. Our reading of the complaint reveals that even if LM did not expressly allege collusion between MSD USA and the Medtronic Defendants, collusion is implicit in its allegations. For the Medtronic Defendants to have used the loaner program or the recall to further their anticompetitive goals in the manner LM alleges, they must have had MSD USA's cooperation.

But allegations of collusion between a signatory and a nonsignatory, alone, are not enough to estop a signatory from avoiding arbitration with a nonsignatory. Rather, allegations of collusion will support estoppel "only when they establish that the claims against the nonsignatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause." *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 975 (11th Cir. 2002) (brackets omitted) (internal quotation marks omitted), *reversed on other grounds sub nom. Pacificare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003); *see also PRM Energy Sys., Inc.*, 592 F.3d at 835. "The linchpin for equitable estoppel is equity–fairness." *Grigson*, 210 F.3d at 528. "The plaintiff's actual dependance on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *In re Humana Inc.*, 285 F.3d at 976.

We conclude that even if LM's antitrust claims either expressly or implicitly allege collusion between MSD USA and one or more of the Medtronic Defendants in carrying out either the loaner program or the recall, they are not intimately founded in or intertwined with the obligations contained in the Agreement. The facts here are readily distinguishable from those in other cases in which the court found allegations of collusion between a signatory and nonsignatory were intimately founded in and intertwined with the contract containing the arbitration clause. *Cf. PRM Energy Sys., Inc.*, 592 F.3d at 836

-15-

(holding licensor's allegations that signatory licensee and nonsignatory potential sublicensee conspired to violate provisions of licensing agreement relating to sublicenses were intimately founded in and intertwined with licensing agreement); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177-78 (2d Cir. 2004) (holding charterers' allegations that nonsignatory ship owners conspired to inflate price terms in contracts between charterers and owners' subsidiaries were "undeniably intertwined" with those contracts); *Grigson*, 210 F.3d at 529-30 (holding allegations that nonsignatory defendants tortiously interfered with distribution agreement by pressuring distributor to limit marketing and release of movie were sufficiently intertwined with distribution agreement to compel arbitration where essence of claims required determination whether distributor fulfilled its obligations under agreement); *MS Dealer*, 177 F.3d at 948 (holding allegations that signatory and nonsignatory defendants colluded to charge plaintiff excessive fee under purchase contract were "intimately founded in and intertwined with" plaintiff's obligations under that contract (internal quotation marks omitted)).

In sum, equity does not demand that LM be compelled to arbitrate its antitrust claims against the Medtronic Defendants.  The district court therefore did not err in denying the Medtronic Defendants' motion to compel arbitration.

AFFIRMED.

Entered for the Court


Stephen H. Anderson
Circuit Judge