**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 29, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JEFFREY BELLMAN, an individual;
THOMAS R. SAMUELSON, an
individual,

  Plaintiffs - Appellees,

v.

I3CARBON, LLC, a Colorado limited
liability company; PATRIC GALVIN,
an individual; ROBERT HANFLING,
an individual; FAISAL SYED, an
individual; CHRISTOPHER GALVIN,
an individual; REBECCA GALVIN,
an individual; DAVID SUNSHINE, an
individual,

  Defendants - Appellants.

No. 12-1275
(D.C. No. 1:12-CV-00655-RBJ)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **GORSUCH**, and **HOLMES**, Circuit Judges.

Defendants-Appellants i3Carbon, LLC, Patric Galvin, Robert Hanfling,

Faisal Syed, Christopher Galvin, Rebecca Galvin, and David Sunshine

---

  [*]  This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate
Procedure 32.1 and Tenth Circuit Rule 32.1.

(collectively, "Defendants") appeal from the denial of their motion to compel arbitration of Plaintiffs-Appellees Jeffrey Bellman's and Thomas R. Samuelson's (together, "Plaintiffs") claims for securities fraud. Defendants assert that the district court erred by failing to find that the parties had entered into an enforceable arbitration agreement and by refusing to apply the doctrine of equitable estoppel. Exercising our jurisdiction under 9 U.S.C. § 16(a)(1)(C), which provides that an appeal may be taken from an order denying an application to compel arbitration, we affirm.

## I

## A

Plaintiffs brought this securities fraud case based upon alleged misstatements and omissions made at the time of their investment in i3Carbon, a Colorado limited liability company ("LLC") that acquires, develops, and sells coal and similar commodity resources. Patric Galvin, an officer of i3Carbon, approached Mr. Samuelson and Mr. Bellman in, respectively, the late summer and early fall of 2010, regarding a possible investment in i3Carbon. It is undisputed that Mr. Galvin provided each of the Plaintiffs with a binder of materials (the "Investment Binder(s)") relating to their possible investment. The Investment Binders contained approximately 200 pages of documents, including an unsigned Operating Agreement and two unsigned Subscription Agreements. Plaintiffs submitted declarations stating that neither of them signed, nor were asked to sign,

-2-

the Operating Agreement.[1]  Mr. Samuelson invested $350,000 in i3Carbon in

August and September 2010, and Mr. Bellman invested $250,000 in i3Carbon in

November 2010 and January 2011.

**B**

The Operating Agreement provided to Plaintiffs in the Investment Binders

states that it is an agreement dated "the ___ day of July, 2010" between

Defendants and "the Persons whose names are set forth on Exhibit A attached

hereto."  Aplt. App. at 48 (Operating Agreement, filed May 1, 2012) (formatting

altered).  Plaintiffs claim that the Investment Binders did not contain an Exhibit A

to the Operating Agreement.  The signature page to the Operating Agreement lists

i3Carbon and GSC Holdings, LLC, as the only signatories to the agreement,

although Plaintiffs contend that neither of those parties actually signed the copy

of the agreement included in the Investment Binder.

The Operating Agreement contains an arbitration provision, stating, in

pertinent part:

> Any suit, . . . claim, controversy, action or
> proceeding arising out of or relating to this
> Agreement or the breach, enforcement, termination
> or validity thereof, shall be brought exclusively in

---

[1]  Defendants have implied in their briefing on appeal that a signed copy of the Operating Agreement may exist, but it cannot be located.  However, in their earlier briefing, Defendants admitted that "neither Bellman, nor Samuelson signed either Operating Agreement."  Aplt. App. at 28 (Mot. to Compel Arbitration, filed May 1, 2012).

either (a) the state courts located in the City and County of Denver, Colorado, or (b) before one (1) arbitrator located in the City and County of Denver, Colorado, such arbitration to be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures (an "Arbitration"). In addition to the foregoing, any party that becomes a party to a state court proceeding pursuant to (a) of this Section 11.7 may, upon written notice delivered to all other parties to the proceeding (as set forth in the complaint or other pleadings) to [sic] be transferred and determined solely pursuant to an Arbitration; provided that such party provides notice of its election to have such proceeding be determined by Arbitration within thirty (30) days following its initial receipt of the original complaint filed with a state court pursuant to (a) of this Section 11.7.

*Id.* at 78 (formatting altered).

In addition to the Operating Agreement, the Investment Binders contained a Subscription Agreement. The Subscription Agreement states that it is an agreement "executed by the undersigned in connection with the private placement of Class A Units" and provides a space for the "undersigned Purchaser" to include his name and address. *Id.* at 162 (Subscription Agreement, dated Aug. 27, 2010). The Subscription Agreement includes a forum selection provision, stating that:

Any disputes arising out of, in connection with, or with respect to this Subscription, the subject matter hereof, the performance or non-performance of any obligation hereunder, or any of the transactions contemplated hereby *shall be adjudicated by a court of competent civil jurisdiction sitting in Denver, Colorado and nowhere else.*

*Id.* at 171 (emphasis added).

Mr. Samuelson signed and returned a copy of the Subscription Agreement in August 2010. In September 2010, i3Carbon sent Mr. Samuelson a signed letter agreement confirming his investment and stating, in part, "This letter agreement is intended to clarify the relationship between you and i3Carbon, LLC, and *does not supersede the subscription agreement* or the other materials you have been provided." *Id.* at 39 (Letter Agreement, dated Sept. 23, 2010) (emphasis added). Mr. Samuelson signed and returned the letter agreement to i3Carbon.

Defendants allege that sometime after Plaintiffs received the Investment Binders, but before they made their investments, Plaintiffs had a telephone conversation with Mr. Galvin during which Mr. Bellman "stated . . . that in connection with his investment he required changes in the overall agreement which included specific 'Early Investor' distribution terms that would significantly benefit both Bellman and Samuelson." *Id.* at 186 (Supp. Decl. of Patric Galvin, filed June 1, 2012). According to Mr. Galvin's declaration, Mr. Galvin obtained approval for the requested changes and informed Plaintiffs that he "would have an amended operating agreement prepared to reflect them." *Id.* at 187. Mr. Galvin stated that he "directed the preparation of the First Amended and Restated Operating Agreement" and "directed that copies be sent to [Plaintiffs]." *Id.* Mr. Galvin further declared that he had a subsequent

telephone conversation with Mr. Bellman in which Mr. Bellman claimed to have misplaced the Operating Agreement "and requested that i3Carbon send him another copy which he would then sign and return." *Id.* Mr. Galvin claims that he did this.

Plaintiffs dispute Mr. Galvin's version of events and have submitted declarations stating that they (1) "did not at any time request any revisions or modifications to the Operating Agreement," (2) did not receive a copy of the Amended Operating Agreement prior to this lawsuit, (3) never signed an Amended Operating Agreement, and (4) never discussed the Operating Agreement or Amended Operating Agreement with anyone at i3Carbon. *See id.* at 157 (Decl. of Jeffrey Bellman, filed May 25, 2012); *id.* at 160–61 (Decl. of Thomas R. Samuelson, filed May 25, 2012).

The Amended Operating Agreement that Defendants claim to have sent to Plaintiffs is dated October 5, 2010. It includes an Exhibit A, which lists the shareholders in i3Carbon as GCS Holding, LLC and Mr. Samuelson. Mr. Bellman is not listed on the agreement. The Amended Operating Agreement was signed by i3Carbon and GCS Holdings, LLC, but was not signed by either Mr. Samuelson or Mr. Bellman. The Amended Operating Agreement contains an arbitration provision identical to the arbitration provision in the earlier Operating Agreement.

In September 2011, Mr. Samuelson emailed Mr. Galvin seeking an

update regarding potential dividends to "round A shareholders." *Id.* at 190 (Email from T. Samuelson to P. Galvin, dated Sept. 15, 2011).  Mr. Galvin alleges that these dividends were consistent with the "requested and agreed upon 'Early Investor' provisions" included in the Amended Operating Agreement.  *Id.* at 187.  The email does not reference either the Operating Agreement or the Amended Operating Agreement.

## C

Plaintiffs filed an amended complaint against Defendants on April 17, 2012, alleging various securities-fraud violations.  Defendants filed a motion to compel arbitration on May 1, 2012.  Following full briefing on the issue, the district court held a hearing on June 6, 2012.  At the conclusion of the hearing, the district court denied Defendants' motion on the grounds that Defendants had "presented no evidence that creates a genuine issue of material fact as to whether or not there was a meeting of the minds and an agreement binding on the parties to arbitrate the disputes that have arisen between them with respect to their dealings . . . [with] i3 Carbon."  *Id.* at 298 (Tr. of Hr'g on Mot. to Compel Arbitration, dated June 6, 2012); *see also id.* at 191–92 (Minute Order, dated June 6, 2012).  Defendants subsequently filed a timely notice of appeal.

## II

## A

We review a district court's denial of a motion to compel arbitration de novo, applying the same legal standard employed by the district court. *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997). Although "[t]he Supreme Court has 'long recognized and enforced a liberal federal policy favoring arbitration agreements,'" *Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)) (internal quotation marks omitted), the question "whether parties have a valid arbitration agreement at all" is a "gateway matter[]" that is "presumptively for courts to decide," *Oxford Health Plans LLC v. Sutter*, --- U.S. ----, 133 S. Ct. 2064, 2068 n.2 (2013) (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)) (internal quotation marks omitted). Courts thus review this question "*de novo* absent 'clear[] and unmistakabl[e]' evidence that the parties wanted an arbitrator to resolve the dispute." *Id.* (alterations in original) (quoting *AT & T Techs. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). Whether an agreement to arbitrate exists "is simply a matter of contract between the parties." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013) (quoting *Avedon Eng'g*, 126 F.3d at 1283) (internal quotation marks omitted). As such, we "apply ordinary state-law principles that govern the formation of contracts

to determine whether a party has agreed to arbitrate a dispute." *Id.* (quoting *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006)) (internal quotation marks omitted); *Avedon Eng'g*, 126 F.3d at 1287.

"When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin*, 465 F.3d at 475 (quoting *Avedon Eng'g*, 126 F.3d at 1283) (internal quotation marks omitted). That is, "when factual disputes [seem likely to] determine whether the parties agreed to arbitrate, the way to resolve them isn't by round after round of discovery and motions practice. It is by proceeding *summarily* to trial." *Howard v. Ferrellgas Partners, L.P.*, --- F.3d ----, 2014 WL 1363963, at *7 (10th Cir. 2014). By contrast, "[w]hen it's apparent . . . that no material disputes of fact exist it may be permissible and efficient for a district court to decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration." *Id.* at *1; *see, e.g.*, *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012), *cert. denied*, --- U.S. ----, 133 S. Ct. 2009 (2013); *Hardin*, 465 F.3d at 474–75.

In ascertaining whether questions of material fact remain, we give the nonmoving party—here, Plaintiffs—"the benefit of all reasonable doubts and inferences that may arise." *Hancock*, 701 F.3d at 1261 (quoting *Par-Knit Mills,*

*Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)) (internal quotation marks omitted).  We have previously explained that the framework for analyzing this issue "is similar to summary judgment practice": the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement.  *Id.*  As noted above, if a genuine dispute of material fact exists, the Federal Arbitration Act ("FAA") calls for a summary trial.  *See Howard*, 2014 WL 1363963, at *7.  Only "when it's clear no material disputes of fact exist and only legal questions remain" may a court resolve the arbitration question by ruling on a motion to compel, rather than conducting a summary trial.  *Id.*

Defendants have also argued that the district court erred in rejecting their equitable estoppel argument.  We have not yet decided whether the de novo standard that generally applies to our review of a denial of a motion to compel arbitration also applies to a denial of such a motion based on equitable estoppel, or whether some other standard of review applies.  *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 707 (10th Cir. 2011).  Other circuits are split on this issue, with some courts reviewing such decisions de novo, and others for an abuse of discretion.  *See id.* (noting that the Fourth and Fifth Circuits review for abuse of discretion, while the Third,

Eighth, Ninth, and Eleventh Circuits review de novo).  It is unnecessary for us to decide here which standard applies because Defendants' equitable estoppel argument fails regardless.

We turn now to Defendants' arguments on appeal.

**B**

Defendants principally challenge the district court's determination that, as a matter of law, an agreement to arbitrate between the parties does not exist. Alternatively, Defendants argue that the district court erred by refusing to find that Plaintiffs were equitably estopped from denying the enforceability of the arbitration provision in the Operating Agreement because, according to Defendants, Plaintiffs have benefitted from and attempted to enforce other provisions of the Operating Agreement.  We begin by addressing whether an enforceable agreement exists between the parties and then turn to Defendants' equitable estoppel argument.

As noted above, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir. 2003) (quoting *AT & T Techs.*, 475 U.S. at 648) (internal quotation marks omitted).  And, although the presence of an arbitration clause generally creates a presumption in favor of arbitration, *see ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) ("If a contract contains an arbitration clause, a

presumption of arbitrability arises, particularly if the clause in question contains . . . broad and sweeping language."), "this presumption disappears when the parties dispute the existence of a valid arbitration agreement," *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002); *see also Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.").

We "'apply ordinary state-law principles that govern the formation of contracts' to determine whether a party has agreed to arbitrate a dispute." *Hardin*, 465 F.3d at 475 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Here, the parties agree that Colorado law governs this question. Under Colorado law, a contract requires a "meeting of the minds." *See Schulz v. City of Longmont, Colo.*, 465 F.3d 433, 438 n.8 (10th Cir. 2006) (quoting *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1192 (Colo. 2001)) (internal quotation marks omitted). This is true for both express contracts and contracts that are implied in fact based on the conduct of the parties. *See id.*; *see also N.Y. Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 412 (10th Cir. 1996) ("Although implied in fact contracts can be based on the conduct of the parties, 'there must be a meeting of the minds before any contract will be implied.'" (quoting *A.R.A. Mfg. Co. v. Cohen*, 654 P.2d 857, 859 (Colo. App. 1982))).

Here, the district court concluded that "the defendant has presented no evidence that creates a genuine issue of material fact as to whether or not there was a meeting of the minds and an agreement binding on the parties to arbitrate the disputes that have arisen between them." Aplt. App. at 298. We agree. Specifically, we conclude that Defendants have failed to show that the "conduct of the parties . . . evidences a mutual intention to contract with each other," *N.Y. Life Ins.*, 80 F.3d at 412 (quoting *Tuttle v. ANR Freight Sys., Inc.*, 797 P.2d 825, 829 (Colo. App. 1990)) (internal quotation marks omitted), or that there was a "meeting of the minds," *id.* (quoting *A.R.A. Mfg.*, 654 P.2d at 859) (internal quotation marks omitted).

Defendants argue that Plaintiffs manifested their acceptance of the Operating Agreement, and specifically the arbitration provision, when they invested in i3Carbon following receipt of the approximately 200-page Investment Binder. However, the Operating Agreement included in the Investment Binder did not have Plaintiffs' names on it and did not indicate that Plaintiffs were expected to sign it. Moreover, Plaintiffs have submitted uncontroverted evidence that (1) i3Carbon never requested that they sign the Operating Agreement or agree to its provisions, and (2) Plaintiffs, in fact, did not sign the Operating Agreement.

Defendants attempt to minimize the importance of the parties' failure to sign the Operating Agreement by arguing that an arbitration agreement does not

-13-

need to be signed to be enforceable. Specifically, Defendants correctly note that "[w]hile the [FAA] requires a writing evidencing an agreement to arbitrate disputes, it is well-established that the FAA does not require signatures of the parties to be enforceable." Aplt. Opening Br. at 19; *see, e.g.*, *Med. Dev. Corp. v. Indus. Molding Corp.*, 479 F.2d 345, 348 (10th Cir. 1973) (noting that it is "not necessary . . . that a party sign the writing containing the arbitration clause"). However, while a signature is not always required, the parties must still have entered into a valid arbitration agreement under state law. *See E-21 Eng'g, Inc. v. Steve Stock & Assocs., Inc.*, 252 P.3d 36, 39 (Colo. App. 2010) ("[T]he lack of signature in and of itself does not invalidate an otherwise enforceable agreement to arbitrate."). Thus, while Defendants are correct in asserting that the parties' failure to sign the Operating Agreement is not dispositive, this does not relieve Defendants of their burden to establish the existence of an enforceable agreement in the first place.

Here, Defendants have failed to carry their burden of showing that an enforceable arbitration agreement exists. First, it is undisputed that the Investment Binder contained conflicting provisions regarding arbitration. While the Operating Agreement provided for arbitration, the Subscription Agreement did not. In our view, the documents in the Investment Binder do

not demonstrate a meeting of the minds regarding arbitration.[2]

Furthermore, we underscore that the only signed documents in the record are Mr. Samuelson's August 27, 2010 Subscription Agreement and the September 22, 2010 letter from i3Carbon to Mr. Samuelson. Neither of these documents evinces an agreement by Plaintiffs to arbitrate their claims. To the contrary, the Subscription Agreement explicitly provides that any disputes shall be heard by "a court of competent civil jurisdiction sitting in Denver, Colorado and nowhere else." Aplt. App. at 171. The September 22, 2010 letter reiterates that it was intended to clarify the relationship of the parties, but "does not supersede the subscription agreement or the other materials you have been provided." *Id.* at 39. While the September 22 letter specifically references the Subscription Agreement (which explicitly provides that disputes will be resolved by the courts) it does not do the same with regard to the Operating Agreement, or otherwise identify any arbitration provision.

Defendants have failed to articulate why the Operating Agreement

---

[2]    This is consistent with the approach taken by other courts. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 838 F. Supp. 2d 967, 992 (C.D. Cal. 2012) (refusing to compel arbitration where two documents contained conflicting arbitration provisions that were "not only ambiguous" but also "fundamentally incompatible"); *Rockel v. Cherry Hill Dodge*, 847 A.2d 621, 623–24 (N.J. Super. Ct. App. Div. 2004) (holding that where "parties executed two documents which contain separate and somewhat disparate arbitration clauses[, t]his ambiguity . . . is fatal to the compelling of the arbitration of plaintiffs' . . . claims").

(including its arbitration provision)—which neither of the parties signed—should be binding, but the Subscription Agreement—which was contained in the same binder and actually signed by Mr. Samuelson—should not be enforced.[3] Defendants' argument essentially boils down to their assertion that Plaintiffs' mere investment in i3Carbon following their receipt of a binder containing an unsigned Operating Agreement somehow establishes that Plaintiffs agreed to, and accepted, the terms of the Operating Agreement, including its arbitration provision. However, in light of the conflicting provisions contained in the Investment Binder, this argument is unpersuasive.

Based on the foregoing, the district court correctly concluded that no genuine dispute of material fact exists regarding whether the parties entered into an agreement to arbitrate. Accordingly, the district court properly denied Defendants' motion to compel arbitration on this basis.

---

[3]     Any attempt by Defendants to give the unsigned Operating Agreement particular weight or significance is unpersuasive. The validity of the Operating Agreement, including whether the parties agreed to its terms, whether those terms are ambiguous, and whether its terms conflict with the Subscription Agreement, must be determined under ordinary state contract law. *See, e.g.*, *Condo v. Conners*, 266 P.3d 1110, 1115 (Colo. 2011) (rejecting argument that operating agreement functioned as a "super-contract" and finding instead that an operating agreement should be interpreted "in light of prevailing principles of contract law"); *In re DB Capital Holdings, LLC*, 463 B.R. 142, 2010 WL 4925811, at *3 n.21 (B.A.P. 10th Cir. 2010) (unpublished disposition) ("Absent a contrary statutory provision, Colorado courts consider a limited liability company's operating agreement according to the general principles of contract law.").

**C**

We turn now to Defendants' argument that "Plaintiffs are equitably estopped from asserting their lack of signature on the Operating Agreements as a basis [for] avoiding arbitration." Aplt. Opening Br. at 23. In support of their argument, Defendants cite *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411 (4th Cir. 2000), which states:

> In the arbitration context, the [equitable estoppel] doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.

*Id.* at 418; *see also Pikes Peak Nephrology Assocs., P.C. v. Total Renal Care, Inc.*, No. 09-CV-00928-CMA-MEH, 2010 WL 1348326, at *8 (D. Colo. March 20, 2010) (finding that plaintiff was bound by unsigned arbitration agreement where plaintiff received benefits from the contract and sought to enforce his rights under the terms of the contract). However, both *International Paper* and *Pikes Peak* involved situations where the non-signing party sought to take advantage of beneficial terms of the agreement while simultaneously disavowing the enforceability of the agreement's arbitration clause. *See Int'l Paper*, 206 F.3d at 418 ("International Paper's entire case hinges on its asserted rights under the . . . contract; it cannot seek to enforce those contractual rights and avoid the contract's requirement that 'any dispute arising out of' the

-17-

contract be arbitrated."); *Pikes Peak*, 2010 WL 1348326, at *8 ("[B]ecause [plaintiff] seeks adjudication of his rights and remedies under the [agreement], and because he . . . seeks the benefits of the [agreement], it follows that he would at least be bound by the contractual procedures for resolving disputes arising therefrom."). Here, in contrast, Plaintiffs did not receive direct benefits from or seek to enforce their rights under the Operating Agreement. For this reason, the present case is distinguishable from the factual situations present in *International Paper* and *Pikes Peak*.

Defendants disagree with this conclusion, arguing that Plaintiffs did in fact benefit from and seek to enforce their rights under the Operating Agreement. Specifically, Defendants point to a telephone conversation between Plaintiffs and Mr. Galvin, in which Mr. Bellman allegedly requested that the "overall agreement" be changed to include distribution terms for early investors. *See* Aplt. App. at 186. Defendants then made changes reflecting Plaintiffs' request in an Amended Operating Agreement. In his declaration, Mr. Galvin asserts that he directed a copy of the Amended Operating Agreement to be sent to Plaintiffs. However, Plaintiffs have submitted declarations swearing that they never received the Amended Operating Agreement, and that neither of them ever signed or agreed to the terms of the Amended Operating Agreement. Several months later, Mr. Samuelson sent an email to i3Carbon requesting early investor distributions. The email did not

reference the Operating Agreement or the Amended Operating Agreement in any way.[4]

Based on these facts, Defendants cannot establish that Plaintiffs sought a change to the Operating Agreement and thereafter sought to benefit from or enforce rights under the original or amended agreement. For one, Plaintiffs merely sought a change to the "overall agreement." *See id.* at 157, 160, 186–87. They never requested that the change be made to the Operating Agreement (which contains the arbitration provision) or that the change be reflected in an Amended Operating Agreement. Thus, the fact that Defendants chose to reflect the change in the Amended Operating Agreement does not somehow elevate that document above the other documents sent to Plaintiffs in the Investment Binder, such as the Subscription Agreement (which explicitly provides that courts will resolve the disputes).

Moreover, as Plaintiffs note, they "never agreed that their entire agreement was governed by and reflected in either Operating Agreement, and [they] did not receive or sign the Amended Operating Agreement." Aplee. Br. at 28. Defendants have not established otherwise. Thus, contrary to

---

[4]    With regard to the email, the district court noted: "You can read that e-mail exchange until you're blue in the face, and you will not find any express or, in my view, implied indication in there that either Mr. Bellman or Mr. Samuelson were agreeable to the terms of either version of the operating agreement." Aplt. App. at 294.

Defendants' assertion, there is no evidence that Plaintiffs "sought to rely on provisions in the Amended Operating Agreement to request early investor distributions." Aplt. Reply Br. at 16. In fact, Defendants cannot even establish that Plaintiffs received the Amended Operating Agreement,[5] much less that they agreed to its terms. And it is undisputed that Plaintiffs never received an early investor distribution, and they have not made a claim for such a distribution in their pending lawsuit. Furthermore, the present case is distinguishable from *International Paper* and *Pikes Peak* in that Plaintiffs' "amended complaint states no claim for any relief or indication that the plaintiffs are seeking any benefit under the terms of the operating agreement in either form." Aplt. App. at 295–96. Indeed, the Operating Agreement is not mentioned anywhere in the amended complaint.

Defendants acknowledge that Plaintiffs have not alleged a breach-of-contract claim, but nonetheless argue that equitable estoppel should apply because Plaintiffs have included claims "that relate in various ways to the

---

[5] Mr. Galvin declares in his supplemental affidavit that he had a telephone conversation with Mr. Bellman in which Mr. Bellman "stated that he had misplaced the Operating Agreement and requested that i3Carbon send him another copy which he would then sign and return." Aplt. App. at 187. However, as noted by the district court, even "[t]aking that as true, it does not mean that [Mr. Bellman] received or certainly signed . . . the amended version of the operating agreement." *Id.* at 294.

Operating Agreement."[6]  Aplt. Opening Br. at 15.  However, in *Lenox*, a case

arising under Colorado law, a panel of our court held that the doctrine of

equitable estoppel does not apply merely because plaintiffs have asserted

claims that relate to or are "factually significant" to the agreement at issue

embodying the arbitration provision.  449 F. App'x at 709–10.  More

specifically, "[f]or a plaintiff's claims to rely on the contract containing the

arbitration provision, the contract must form the legal basis of those claims; it

is not enough that the contract is factually significant to the plaintiff's claims

or has a 'but-for' relationship with them."  *Id.* at 709.  In other words, "[t]he

claims must be 'so intertwined with the agreement' that 'it would be unfair to

allow the signatory[7] to rely on the agreement in formulating its claims but to

disavow availability of the arbitration clause of that same agreement.'"  *Id.* at

710 (quoting *PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 835

---

6       Plaintiffs allege numerous securities-fraud violations based on
alleged misrepresentations and omissions made by Defendants.  Specifically,
Plaintiffs claim that Defendants knowingly made false representations and
omissions of material fact relating to the health and sales capacity of i3Carbon in
order to secure funding, thereby violating section 10(b) of the Securities
Exchange Act of 1934, 15 U.S.C. § 78j(b), section 20(a) of the Securities
Exchange Act of 1934, 15 U.S.C. § 78t(a), and various sections of the Colorado
Securities Act.  Plaintiffs also state claims for negligent misrepresentation,
common law fraud, and civil theft pursuant to Colo. Rev. Stat. § 18-4-405.

7       In *Lenox,* a non-signatory sought to enforce an arbitration provision
against a signatory to the agreement.  *See* 449 F. App'x at 705–07.  Here, none of
the parties signed the Operating Agreement.  Moreover, only the Defendants
signed the Amended Operating Agreement; neither of the Plaintiffs did.

(8th Cir. 2010)).

In *Lenox,* the defendants contended that the plaintiff's claims "rely on the Agreement because they are significantly related to, make reference to, or presume the existence of the Agreement." *Id.* at 709. The panel rejected this argument, finding that while the agreement was "factually significant to [the plaintiff's] claims," it did not "form the legal basis for [those] claims" because "[the plaintiff was] not attempting to hold the non-signatory liable pursuant to duties imposed by the agreement, and its claims [did] not depend on whether [the defendants'] conduct was proper under the Agreement." *Id.* at 710 (citation omitted) (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)) (internal quotation marks omitted). As such, the panel concluded that the plaintiff did "not rely on the terms of the Agreement in a manner that would make it unfair for [the plaintiff] to avoid arbitrating those claims." *Id.*

Applying the reasoning of *Lenox* here leads ineluctably to a similar outcome. Specifically, Plaintiffs do not assert a claim for breach of the Operating Agreement or seek to enforce any rights or recover any remedies under the Operating Agreement. While Plaintiffs' complaint relies on materials other than the Operating Agreement provided in the Investment Binder, along with alleged statements made by Defendants, the Operating Agreement does not "form the legal basis" of Plaintiffs' claims. *See id.* at 709–10. Rather,

Plaintiffs' claims are based on allegedly fraudulent misrepresentations and omissions of material fact made by Defendants in order to secure funding. None of these claims relate to statements or omissions made in the Operating Agreement. In fact, as noted above, Plaintiffs' complaint does not even reference the Operating Agreement. It follows perforce that Plaintiffs' claims cannot be deemed to have *relied* on the Operating Agreement in a manner that would make it unfair for Plaintiffs to avoid arbitrating their claims. *See id.* at 710. For these reasons, the district court properly concluded that Plaintiffs are not equitably estopped from disavowing the enforceability of the Operating Agreement's arbitration provision.

### III

For the foregoing reasons, we affirm the district court's denial of Defendants' motion to compel arbitration.

Entered for the Court

JEROME A. HOLMES
Circuit Judge